S. J. GROVES & SONS and COMPANY v. STATE OF NORTH CAROLINA and THE NORTH CAROLINA BOARD OF TRANSPORTATION

No. 8010SC60

(Filed 16 December 1980)

### 1. Highways and Cartways § 9— highway construction —changed conditions —notice of claim for additional compensation — sufficiency of letter

A letter from plaintiff contractor constituted sufficient written notice to defendant Board of Transportation of plaintiff's claim of a "changed condition" at a highway construction site caused by excessive soil wetness and its demand for an equitable adjustment based thereon to comply with § 4.3A of the Standard Specifications for Roads and Structures incorporated into its contract, the plaintiff not being required to spell out in detail the exact nature and extent of the unclassified excavation work it was claiming under a changed condition.

### 2. Highways and Cartways § 9— highway construction — claim for additional compensation — theories before Highway Administrator and trial court

Plaintiff highway contractor was not permitted to recover at trial on a different theory than that presented to the Highway Administrator where plaintiff recovered at trial on the basis of "changed conditions," and its verified claim letter for increased compensation separated the individual claims into three categories of contract termination costs, certain excavation costs, and costs directly arising from changed conditions, the tenor of the claim was that all categories of increased costs were brought about by unanticipated conditions encountered by plaintiff, and plaintiff's letter encompassed the total claim under the last heading of "changed conditions."

### 3. Highways and Cartways § 9— highway construction —changed conditions — excessive wetness of soil — additional compensation

The evidence supported the trial court's determination that the parties were mutually mistaken at the time of plaintiff contractor's bid on a highway construction project as to the soil conditions which actually existed, that the presence of these conditions could not have been anticipated from the contract itself, and that plaintiff encountered "changed conditions" at the work site caused by unexpected and excessive soil wetness so as to entitle plaintiff to an equitable adjustment in compensation from that specified in its contract with defendant Board of Transportation.

### 4. Highways and Cartways § 9— highway construction —changed conditions — compensation for additional work — sufficiency of records

The evidence supported the trial court's determination that plaintiff contractor kept accurate and detailed records with respect to additional work performed on a highway construction project because of excessive soil wetness and gave defendant Board of Transportation the opportunity to supervise and review those records as required by its contract in order to obtain an equitable adjustment in compensation for such additional work on the basis of "changed conditions."

**5. Evidence § 29.2— daily work reports — business records**

In an action to recover additional compensation for extra work performed on a highway construction project because of changed conditions, plaintiff's daily work reports and a compilation of total extra costs based on those reports were admissable under the business entries exception to the hearsay rule.

**6. Highways and Cartways § 9— highway construction — waiver of completion date — no liquidated damages**

Defendant Board of Transportation waived any expectation of adherence by plaintiff contractor to the schedule for completion of a highway construction contract by its refusal to allow plaintiff to waste unsuitable wet soil when initially requested by plaintiff when it knew the wet, unstable soil could not be utilized as indicated in the contract, and defendant was not entitled to assess liquidated damages against plaintiff for plaintiff's failure to complete work under the contract by the completion date set by the contract.

**7. Appeal and Error §§ 28.1, 45.1— proposed finding — failure to request finding in trial court — abandonment of exceptions to findings**

Defendant's proposed finding of fact is not before the appellate court for consideration where defendant failed to request the trial court to make such a finding and then to except to its failure to do so. Furthermore, defendant's exceptions and assignments of error to findings made by the court are deemed abandoned where defendant failed to cite any authority or the portions of the record upon which it relied to support its argument with reference to such findings. Appellate Rule 28(b)(3).

**8. Costs § 4.1— expert witness fee — necessity for subpoena**

The trial court had no authority to tax expert witness fees against appellant as a portion of the costs where the court found only that the expert witnesses "were required" to be present during the entire trial but the record contains no subpoenas for these witnesses.

APPEAL by defendant North Carolina Board of Transportation, from *Bailey, Judge.* Judgment entered 14 July 1979 (out of term and out of district by consent of parties), Superior Court, WAKE County. Heard in the Court of Appeals 4 June 1980.

This action was brought under the provisions of G.S. 136-29 for the recovery of additional compensation arising out of a highway construction contract. The following facts are either admitted in the pleadings or appear from uncontroverted evidence.

On 2 May 1972 defendant, the North Carolina Board of Transportation, began advertising for bids for a highway construction project of a length of 5.369 miles, consisting of the relocation of U.S. 64 from the Clay-Macon County line east toward Franklin to a point approximately one and one quarter miles east of Winding Stair Gap. The work was to be done in two segments. The western segment,

approximately two miles in length was to be completed by 1 October 1973, and liquidated damages were to be in the amount of $100 per day beyond the completion date. The first segment ran easterly from Station 1026 to Station 1119 and then easterly from Station 0 to Station 30, stations being at 100 feet intervals. The remaining three-mile segment ran easterly from Station 30 through Winding Stair Gap to Station 194. Completion date for this segment was 1 July 1975, and liquidated damages were set at $300 per day for failure to complete by the date set.

The project called for the construction of only two lanes. Defendant, however, acquired sufficient right-of-way to accommodate four lanes. The plans indicated that there would be an excess of material over and above that required to construct the embankments for the two lanes. With respect to the excess material, the contract required that the contractor place the suitable excess material in embankments which might be used at some later date in the construction of an additional two lanes of U.S. 64. Pertinent contract provisions are set out in the court's findings of fact, *infra*.

Prior to bidding on the project, plaintiff requested and received the subsurface information used by defendant in designing the project. This report contained the following:

No soils are encountered along the project which are unsuitable for reasons of high plasticity, and only a limited amount of organic soils are encountered. By far the dominant soil types are A-4 and A-5 soils; these are approximately equal in importance. Small local areas contained A-7-5 and A-7-6 soils, but all samples indicate low plastic properties and satisfactory material.

Soils should pose no great problems on this project except for perhaps requiring some stabilization in the elastic A-5 soils.

Local areas on this project contain colluvial deposits (concentrations of loose wet boulders and clay silt) that have concentrated from higher elevations. This material is very unstable if disturbed, since it possesses relatively little cohesion and is usually wet. Many sections on this project undercut colluvial material. We anticipate problems with slope stability in these areas and have designed slopes to

alleviate the problem as much as possible. Some problems will be encountered in this areas (sic), regardless of recommendations.

The contract was awarded plaintiff as low bidder on 23 May 1972, three weeks after the project was advertised for bids, and work was begun on 12 July 1972. The work progressed satisfactorily for a while and then plaintiff began having serious problems with the excessive wetness of the soil and, because proper compactness could not be obtained, had to begin sandwiching with rock to construct the embankments. Defendant refused to allow the unsuitable material to be wasted so that plaintiff could borrow suitable material. Early in June 1973, the first segment was 90% complete, leaving approximately 100,000 to 150,000 cubic yards of unclassified excavation work to be done on this first segment. This work consisted of excavating the material from Black Gap cut and the placement and compaction of it in the future eastbound lane. Plaintiff had used all available rock within the construction limits of this segment in its sandwiching operations. The only cut remaining within the construction limits from which plaintiff could get earth material to complete the embankment fills was Black Gap cut, but this material was too wet for use without rock. Plaintiff called defendant's attention to the problem and asked to be allowed to waste this unsuitable material rather than having to place and compact it in the future lanes. Defendant denied the request contending the material was suitable under the contract. Plaintiff moved equipment to Winding Stair Gap - a large cut full of rock. However, the same excessive wetness was discovered, and plaintiff was forced to put the earth material aside and waste it in order to get to the rock underneath, which it had to blast and haul approximately one and one-half miles back in a westerly direction to complete the sandwiching operation.

On 15 August 1973, plaintiff notified defendant in writing of its claim of a changed condition as follows:

Our contract with you provides all suitable material removed from the excavation shall be used in the formation of embankments.

The special provisions calls the contractor's attention to the fact that the surplus material will be used to construct embankments for the future eastbound lane and any over-usage for the eastbound lane will require contractor to

supply material at his cost.

Our contract is based upon payment for unclassified excavation only, with the cost of placing an embankment to be included in the unit price bid. The specification provides that the embankment materials shall be compacted to a density equal to at least 95 percent of A.A.S.H.O. T99-57 or standard proctor. Copies of the procedure for taking the tests and determining when the contractor was obtaining 95 percent standard proctor was available upon request.

This procedure states: "If the soil is too wet, it cannot be compacted to the required degree and it will be necessary to let it dry out."

Such statement recognizes the impossibility of compaction if the soil is too wet.

As you are well aware, the contract with you provides a stringent completion schedule, with the contractor being required to construct the project from Station 1029+04 to Station 30+00 by October 1, 1973, including the -Y-lines and driveways, to the extent that payment is placed.

If the project is not completed from Station 1029+04 to Station 30+00 by October 1, 1973, such that two-way traffic could be placed and maintained on the highway, the contractor is to be charged with $100 per day liquidated damages. The entire project is to be completed by July 1, 1975.

Furthermore, statements were made by the Highway Commission in noncontractural documents prior to bid that, "Soils should pose no great problems on this project, except for perhaps requiring some stabilization in the elastic A-5 soils."

We have, since starting construction in August of 1972, experienced extremely high moisture conditions in the soil due to a number of factors, particularly excessive rain. The soil is unsuitable, particularly when wet, and we have not obtained any drying weather.

Because of the rain, lack of drying conditions, ground water, physical site drainage conditions and particularly the density requirements which are a part of this contract,

compaction of soil has been throughout performance and is at this time strictly impossible.

Moreover, the Highway Commission has orally refused to recognize the impossibility of any alternative, such as recognizing that the soils on this project are unsuitable for compaction. A particular example of the alternative is the area of Black Gap, where the A-5 soils, according to pre-bid data, exist. These soils should be stabilized or designated unsuitable.

Our contract with you has a changed condition clause. With the schedule demanded and the superior knowledge of the Highway Commission and its design engineers, the contract was based on the fact that the soils could be compacted. We believe that the excessive moisture in the soils of the project created by excessive rain and other reasons, the drainage characteristics and soil conditions constitute a changed condition requiring that the Highway Commission grant us equitable adjustment and extension of time.

We have been advised, based on the history of this project and the facts we know to date, there are several alternate contract doctrines to changed conditions supporting an equitable adjustment and an extension of time.

Pursuant to the specifications and in order to further protect our position in this matter, we hereby notify the Commission in writing that we are now having and have had since the beginning of this project a changed condition of which employees of the Commission have had knowledge.

We have previously orally notified you of the soil compaction problems. Further, we request a meeting to see if the contractor and Commission can reach an agreement concerning an equitable adjustment and time extension for a changed condition and for other reasons.

On 18 September 1973, defendant notified plaintiff that it took the position that no changed condition existed. In that letter defendant advised plaintiff that "If S. J. Groves & Sons Company desires to pursue this matter further it will be necessary that you notify by letter Mr. Ray Spangler, Resident Engineer, of this fact. Prior to writing this

letter, please review Article 4. 3A and the Supplement of Standard Specification. It will be your responsibility to keep an accurate and detail (sic) cost record of the affected work. These cost records are to be kept with the same care as Force Account Records and Mr. Ray Spangler must be given opportunity to supervise and check all records pertaining to your request."

In response to that letter plaintiff on 25 September wrote to defendant as follows:

September 25, 1973

Sheet 2 of 2

Department of Transportation and Highway Safety
Attention: Mr. W. F. Ray, Division Engineer

S. J. Groves & Sons Company will, as we so advised in the meeting, do our best to keep costs of the changed conditions in accordance with a reasonable interpretation of the contract.

In addition, we will, in prosecuting the work, cooperate with the Highway Commission in performing inspections, surveys, studies, other activities or engineering functions including the taking of cross sections and establishing center lines as requested in the next to last paragraph of your September 18, 1973 letter. However, S. J. Groves & Sons Company will not, in accordance with your request for which there is no contract support, delay, allow interference with, or cease any operation or operations which we deem to be to our benefit to continue.

In November 1973, after completion date, defendant directed plaintiff to waste the remaining material at Black Gap.

Plaintiff filed a verified claim dated 6 October 1975 which was denied by letter of the State Highway Administrator dated 21 April 1976. On 25 June 1976, this action was filed in the Superior Court of Wake County pursuant to the provisions of G.S. 136-29.

After hearing the evidence the court entered findings of fact, and conclusions of law "based on the pleadings, the stipulations of the parties as contained in the pretrial order entered in this matter, the testimony of all witnesses, and all the documentary evidence presen-

ted by the parties." Of paramount relevance to this appeal are the following findings of fact and conclusions of law:

> (4) That the parties entered into a construction contract on or about June 26, 1972 in the amount of Five Million Three Hundred Eleven Thousand Four Hundred Fifty and 82/100 ($5,311,450.82) Dollars, based on estimated quantities involving given unit prices, to be paid the plaintiff for the construction of a 5.369 mile section of a highway known as U.S. 64, which construction involved the relocation of U.S. 64 from the Clay-Macon County line in Black Gap northeasterly through Winding Stair Gap to approximately 6,900 feet northeast of Winding Stair Gap. This project was designated as State Project No. 8.3064114, and also Federal-Aid Project APD-16-1 (10). The costs of this project were to be shared equally between the State of North Carolina and the United States Federal Government.

> (5) That this project was duly advertised for bids beginning May 2, 1972; and, that the bids were opened and the contract awarded to plaintiff, as the lowest bidder, on May 23, 1972. . . .

> . . .

> (7) That with respect to the excavation work to be performed, the pertinent parts of the contract documents provided as follows:

>> (a) "Soils should pose no great problems on this project except perhaps requiring some stabilization in the elastic A-5 soils." (Sheet 3 of Subsurface Investigation Report.)

>> The foregoing was a summary of the description of the soils bored and tested by the State as being representative of the natural in place condition of the soils to be encountered in the cuts and to be used in the fills on this project.

>> While the Subsurface Investigation Report indicated that some cuts would contain "moist" to "damp" to "wet" materials, and while the report further indicated that subsurface ground water would be en-

countered in the soils contained in the cut material, when the report and other contract documents were and are considered together and in their entirety, there were and are affirmative indications that the ground water could be drained from the cuts in a practical manner and that the materials which were "wet"or "damp" could be dried in a practicable manner and used in the fills in a balanced grading operation and within a reasonable time.

This subsurface report, along with the related plans and specifications, in sum and substance indicated and represented that all soils would be suitable for use in the embankment fills except for approximately 2,100 cubic yards of soils shown underlying two fill areas which would have to be undercut and wasted as being unsuitable.

(b) The contract plans showed that there would be a substantial surplus of excavation material as opposed to fill material required for construction of the two lane highway proposed.

In this connection and in conjunction with the contractural (sic) representations that all excavation materials would be "suitable" for embankment use and would pose no great problems to the contractor, both the location and the quantities of excavation and fill as shown in the contract plans indicated to the contractor that he would be able to conduct a balanced grading operation consisting of minimum hauls by placing the excavation quantities obtained from the closest cuts into the closest adjacent fills.

(c) Article 22-1.2 of the Standard Specifications provided as follows: "Unsuitable material shall be classified as any material which is unsatisfactory for use under a base course or pavement. It shall not include any rock undercut in the roadbed." A special provision for this project, however, deleted this Standard Provision with respect to "unsuitable materials," and indicated, in effect, that all soils materials on the

project would be suitable and could and would be used for embankment fill, and that the expected surplus material excavated from cuts and not needed in fills would be placed in an eastbound future lane where such surplus material would be sloped and compacted the same as the fill material used in the two lane proposed to be constructed by the project. (Page 4 of the Project Special Provisions).

(d) Article 25-3.3 of the Standard Specifications as amended by Section 20 of the amended Standard Specifications (p. 32), and as further supplemented by the Standard Special Provisions, provided in pertinent parts as follows: "The embankment material shall be thoroughly compacted. . .shall be rolled for its full width and thoroughly compacted to a density equal to at least 95% of that obtained by compacting a sample of the material with the equipment and in the manner prescribed by AASHO T99-57. The moisture content of the sample material will be at the optimum estimated by the Engineer for proper compaction.

In short, the compaction requirements for the embankment material on this project were stringent, and the related contract documents indicated that the embankment materials would be "suitable" and could be compacted in a practicable manner according to AASHO T99-57.

(e) Section 22 of the Standard Specifications provided that: "All suitable material removed from the excavation shall be used *as far as practicable* in the formation of embankments, subgrade, shoulders, and at such other places as directed."

(f) Standard Special Provision entitled "Proof Rolling" set forth that the finished subgrade shall be tested and rolled by "heavy pneumatic tired compaction equipment for compacting the roadbed and testing the roadbed for stability and uniformity of compaction." The section further provided in detail the type and weight of the proof rolling equipment

Groves & Sons v. State

required and the manner in which the proof rolling was to be done. In particular, it further provided as follows: "If it becomes necessary to take corrective actions, such as, but not limited to, underdrain installation, undercut and backfill of unsuitable material and aeration of excessively wet material in areas that have been proof rolled, these areas shall be proof rolled again following the completion of the necessary corrections. If the corrections are necessary due to the negligence of the Contractor or weather, the corrective work and additional proof rolling shall be performed by the Contractor at no cost to the Commission."

(g) The time requirements of the contract provided that the project would be available for the beginning of construction from July 3, 1972; and, that the western approximately two (2) mile portion of the project (from Station 1029+04 to Station 30+00) must be completed by an intermediate completion date of October 1, 1973. All work, on the entire 5.369 miles of roadway, was to be completed by July 1, 1975.

Thus, while the project contained stringent intermediate and final completion dates, implicit in those time prescriptions was an affirmative indication or representation that this work *could be accomplished within the times prescribed.*

(h) Paragraph (E) of the Standard Special Provisions relating to the "Protection of the Environment" provided as follows: "The Contractor shall perform excavation, borrow, and embankment operations in such a manner that cut and fill slopes will be completed to final slopes and grade in a continuous operation. The operation of removing excavation material from any cut and the placement of embankment in any fill shall be a continuous operation to completion unless otherwise permitted by the Engineer. The excavation, borrow, and embankment operations will not be allowed to accumulate exposed, erodible areas in excess of seventeen (17) acres at any

one given time without the Contractor's beginning permanent seeding and mulching and other erosion control measures."

(i) Paragraph 4.3A of the Standard Specifications as amended (p.4) provided in pertinent part as follows: "Should the Contractor encounter or the Commission discover during the progress of the work *conditions at the site differing materially from those indicated in the contract,* which conditions could not have been discovered by reasonable examination of the site, the Engineer shall be promptly notified in writing of such conditions before they are disturbed. The Engineer will thereupon promptly investigate the conditions and if he finds they do so materially differ and cause a material increase or decrease in the cost of performance of the contract, an equitable adjustment will be made and a supplemental agreement entered into accordingly.

In the event that the Commission and the Contractor are unable to reach an agreement concerning the alleged changed conditions, the Contractor will be required to keep an accurate and detailed cost record which will indicate not only the cost of the work done under the alleged changed conditions, but the cost of any remaining unaffected quantity of any bid item which has had some of its quantities affected by the alleged changed conditions, and failure to keep such a record shall be a bar to any recovery by reason of such alleged changed conditions. Such cost records will be kept with the same particularity as force account records and the Commission shall be given the same opportunity to supervise and check the keeping of such records as is done in force account work."

(8) That the pertinent contractural (sic) provisions set forth hereinabove, as they pertained to the unclassified excavation work, constituted both requirements of and representations and positive indications to the plaintiff that the in place nature and properties of the soil materials to be excavated from the cuts and to be placed and compacted in the fills were such as to allow practicable use of these soils in

the fills, and that these excavated soils could be dried and compacted according to contract specifications and within the given contract time limits.

In other words, inherent in each such requirement was also a representation or indication to the plaintiff that such requirement could be met with reasonable and practicable effort on the plaintiff's part. For example, the compacting, proof rolling, and construction time requirements were very stringent.

Accordingly, implicit in those same stringent requirements was an accompanying indication or representation to the plaintiff that these requirements could be met with reasonable effort and within a reasonable time in order to meet the contractural (sic) requirements.

(9) That the defendants furnished the plaintiff all of the contract documents after May 2, 1972 in order that the plaintiff could examine and analyze the same and formulate its bid based thereon before the bid opening date of May 23, 1972. These documents were not made available to any prospective bidders prior to the advertising date of May 2, 1972, so the plaintiff, as well as other bidders was allowed only three (3) weeks in which to examine and analyze the contractural (sic) documents, make a reasonable examination of the site, and submit its bid. The plaintiff's personnel, including its estimator for this project with approximately twenty-five (25) years in construction experience, examined the site of construction on May 15, and 16, 1972, approximately five (5) days after receiving the bid documents. At this time, the project for the most part was heavily wooded with trees and other natural ground vegetation.

They drove around the perimeter of the project, and then walked the centerline of the project from Black Gap on the western end and easterly toward Winding Stair Gap as far as the centerline stakes existed to the beginning of Winding Stair Gap. The weather was clear during this period of time and the ground was not wet or noticeably soft.

There was a logging operation being conducted at a point

approximately one-half way through the project, and the logging trucks and other support equipment were having no problem with a wet or unstable ground surface.

As a part of the site examination, the plaintiff also confirmed the local prices for materials to be incorporated into its work such as concrete and aggregate. In short, the site examination and investigation indicated nothing to the contrary with respect to the subsurface soil conditions from that already indicated in the contract documents.

There was not sufficient time nor was it economically practicable or feasible within the advertising and bidding time for the plaintiff to conduct its own subsurface drilling and exploration program to confirm or contradict that which was already indicated in the contract douments with respect to the natural in place condition of the subsurface soils to be encountered. In short, the plaintiff's personnel conducted a reasonable examination of the site prior to bid, and there existed no reasonable observable physical facts within the project boundaries which would have indicated to the plaintiff that any geological problems existed which would cause the plaintiff any great problems with respect to excessive moisture content contained in the subsurface soils or which would prevent the plaintiff from performing its work in a balanced grading operation using suitable fill materials and being able to compact the soils according to contract indications and requirements and within the contract time limitations.

(10) That the plaintiff commenced his work pursuant to all of the foregoing terms of the contract in a timely manner in mid-July, 1972. At the preconstruction conference held immediately prior to work beginning, he advised the defendants that he intended to conduct a second shift each work day (a night shift) whenever feasible and practicable.

The defendants had not been prepared for this type of operation involving this rate of progress, and they had to hire additional inspectors to work with this night shift.

Nevertheless, the defendants' welcomed this qbvious display of intent on the plaintiff's part to complete its contrac-

tural (sic) obligations not just within the allowable contract time but even possibly sooner than required by the defendants. In addition, the plaintiff commenced work with an impressive spread of earth moving equipment consisting of scrapers, dozers, end-dump machines, loaders, backhoes, and drilling and rock blasting machinery.

(11) That almost from the beginning of construction, however, excessively wet and unstable materials were encountered in the cuts which were unsuitable for use in the adjacent fills. With the amount of rainfall that was occurring in that area, it was both economically impracticable and a physical impossibility to dry this excavation material sufficiently so that it could be stabilized, sloped and compacted in the fills according to contract requirements and within the contract time. Faced with this practical impossibility, the plaintiff had to abandon his original grading operation plan whereby it had intended to excavate the closest cuts and place this material in the nearest fills in a conventional and balanced grading plan.

Rather, the plaintiff had to initiate a "select borrow" operation within the construction limits whereby it would have to go to the closest available rock cuts, remove the overburden, drill and blast the rock, haul the rock and use this rock to commence the fills, and then alternate thereafter in each fill a layer of earth and then a layer of rock until subgrade was reached.

Accordingly, rather than having a balanced and sequential earth moving operation whereby the closest excavation could be placed in the nearest fill, the plaintiff was forced into an unbalanced select operation of having to construct his fills by placing the closest rock between alternate layers of excessively wet, unstable and thus unsuitable earth materials.

(12) That shortly after the beginning of construction and at least by May 1, 1973, both the defendants and the plaintiff discovered that the earth material excavated from the cuts was unexpectedly excessively wet and unstable and could not be sloped and compacted according to contract specifications within the contract time. The defendants, as well

as the plaintiff, then realized that the subsurface conditions existing at the time of bids and to be encountered on the project were not as had been represented or indicated by the contract documents prior to bid and were not compatible with the manner in which the project had been planned and designed.

(13) That according to the testimony of the defendants' own Resident Engineer, who was responsible for the administration of the contract and who supervised the inspections of the plaintiff's work for the most part of the project, the following considerable problems with soil conditions were encountered by the plaintiff almost from the beginning of construction and thereby dictated the accompanying changes in the Contractor's method and manner of performance of the general excavation work required under the contract;

(a) The major item of work required under the contract was the unclassified excavation which the contract documents indicated to be in the approximate amount of 4,267,000 cubic yards at the plaintiff's bid price of $.79 per cubic yard, or a total price for doing the excavation of Three Million Three Hundred Seventy Thousand Nine Hundred Thirty and No/100 ($3,370,930.00) Dollars.

(b) That the contract documents, and in particular the plans, indicated that all of the soil materials excavated from the cuts could be used in the fills and compacted according to contract specifications and requirements; that the plans indicated that there would be a surplus of 924,718 cubic yards of soil materials excavated from the cuts and not needed in the fills of the highway being built but which would be suitable and would have to be placed and compacted according to contract requirements in a future eastbound lane; that the contract documents and, in particular, the plans indicated that only 2,150 cubic yards of undercut or unsuitable material might be encountered and need to be wasted, this undercut being indicated to exist in two certain fill areas; that

"unsuitable" material, or material that would have to be wasted rather than used in embankments and compacted, would be and was material that in effect could not be dried and compacted within a reasonable time and in a practicable manner; and, that except for the 2,150 cubic yards of undercut shown in the plans to possibly require wasting, the plans indicated all other excavation material would and could be placed in the embankment fills and compacted.

(c) That as Resident Engineer, he never had any reservations about the amount of equipment that plaintiff initially brought to the site to perform the contract; that the plaintiff's equipment was in good shape; that for the life of the project the plaintiff cooperated with him in attempting to coordinate the work so that the contract work could be completed as soon as possible; that he was completely satisfied with the plaintiff's efforts in the execution and completion of the work; that the plaintiff always had sufficient personnel and equipment who would work when the soil and weather conditions would permit; that the soil materials in general throughout the project when excavated from the cuts were quite often wet and very slow to dry; that as a result of the wet material coming from the cuts and the plaintiff's inability to dry the same within the contract time limits, the plaintiff had to resort to constructing the fills with the alternate use of layers of rock with layers of soil materials, which was a "sandwich method" of operation; that the plaintiff had to resort to this sandwiching operation from early in the project; that while the plaintiff did not complete its work in the first phase of the project until approximately one year beyond the contract intermediate completion date of October 1, 1973, the plaintiff could not have even completed this work by that time without using this "sandwiching" method of operation; and, that the effects of this sandwiching method of operation required the plaintiff quite often to haul outside the balance points throughout the project rather than

within the balance points as indicated in the plans because the location of rock to be used in the sandwiching of fills controlled the hauls of excavated materials for the construction of fills rather than the location of soil materials between the balance points.

(d) That in general the plaintiff's progress from the beginning of construction in July, 1972 up through May, 1973 was good; that beginning in May, 1973, however, the cut material located in Black Gap in the approximate quantity of 100,000 cubic yards were extremely wet and unsuitable for use in embankment fills in their natural undisturbed state and could not be used in the remaining fills to be constructed in the first phase; that the excavation and disposal or attempted use of these materials from the Black Gap cut controlled the completion of the first phase from May, 1973 until the final completion of this phase; that the plaintiff's unclassified excavation work as of June, 1973 was 90% complete in the first phase of the project; and, that if plaintiff had been allowed to waste the unsuitable materials contained in the Black Gap cut beginning in June, 1973, then he could have completed the first phase of the project on time by the contract intermediate date of completion of October 1, 1973; that beginning in early June, 1973, the plaintiff began requesting of the defendants that it be allowed to waste the Black Gap cut materials as being "unsuitable" and replace these materials necessary for the completion of the remaining fills with "borrow" soil materials and rocks from outside of the slope stakes of the project construction limits; that there was little or no rock remaining in the cuts left in the first phase by this time, so the plaintiff could not continue its sandwiching operations without these borrow materials; that in June, 1973, the plaintiff advised the defendants that it was quite obvious that not only would all the remaining cut material in Black Gap require wasting as unsuitable but that it was also obvious that when this unsuitable material was excavated to planned grade that substantial amount

of undercutting of the material in this cut below planned grade would be necessary if this phase of the project was ever going to be completed; that notwithstanding these continuing requests and advices from plaintiff to defendants concerning how the job was going to have to be completed, the defendants refused to allow the plaintiff to waste and undercut these materials in Black Gap until the beginning of November, 1973; that as a further result of the defendants preventing the plaintiff from wasting this unsuitable material contained in the Black Gap cut from May, 1973 until November, 1973, it was impossible for the plaintiff to achieve any significant progress in the completion of its unclassified excavation work in the first phase; that as a further result of the foregoing and although only 10% of the unclassified excavation work remained to be done in the first phase as of June, 1973, the plaintiff could not complete this remaining 10% of this work until July, 1974; and, that the other items of work under the contract such as laying of the base course for pavement, the laying of pavement, the construction of guard-rails, etc., were dependent and sequential in nature, namely, this work in general could not be begun and accomplished until all the unclassified excavation work had been completed.

(e) That as a result of being unable to continue its work in the first phase of the project beginning in June, 1973, the plaintiff had to shift its equipment and personnel and begin concentrating its work on the eastern end of the project at Winding Stair Gap where considerable sources of rock existed; that there were considerable quantities of earth materials in the cuts leading up to Winding Stair Gap with which the plaintiff could have excavated and completed the fills west from Winding Stair Gap but for the fact that this material, quite similar to the cut material in Black Gap, was excessively wet in its undisturbed natural state and unsuitable for use in the embankment fills; that as a result of the foregoing, the plaintiff was

required to concentrate his excavation operations to the blasting and hauling of rock from the cut on top of Winding Stair Gap, then hauling this rock back westwardly for the construction of the fills by the "sandwich method" from Winding Stair Gap back towards the end of the first phase of the project at Station 30.

(f) That in the middle of July, 1973, the plaintiff met with the defendants and told the defendants that in order to construct any further fills in the first phase that the plaintiff was going to have to borrow rock from outside the construction limits; that the Resident Engineer admitted to plaintiff at this time that this was the only practicable way to continue any work in this phase but denied that the defendants would pay for this rock borrow; that the plaintiff then informed the defendants that it was going to borrow this rock and present a claim for the payment of the same since the contract had no provisions or established price for the use of borrow and had, in fact, indicated no borrow would ever be necessary for construction of fills; that as a result of the plaintiff's notice to defendants of its need and intent to use this borrow and claim extra compensation for the cost of performing this operation, the Resident Engineer then cross-sectioned the borrow area prior to the removal of this rock borrow in order that it could be ascertained at a later date how much rock had been borrowed from this area; that from the end of July, 1973, until the completion of the first phase, the plaintiff borrowed rock from outside the construction limits from Station 1072 to 1078 and used the same for the backfill of undercut required but not shown on the contract plans in Black Gap and for the related construction of fills immediately adjacent to this undercut area. That when the defendants finally directed the plaintiff to waste the remaining cut material in Black Gap and subsequently undercut the same, this same borrow rock was directed to be used to replace this undercut material at an agreed upon unit price.

(g) That on or about August 15, 1973 the plaintiff notified the Resident Engineer that it was claiming a changed condition that was then affecting and had been affecting its excavation work since the beginning of the project; that on October 2, 1973 the Resident Engineer met in plaintiff's field office to review with plaintiff how the plaintiff's cost records were being kept as pertained to the claimed changed condition; that the plaintiff then showed the defendants its daily records and how it had been keeping strict account of its operating labor and equipment performing excavation work; and, that in addition the plaintiff then explained to the defendants that it was having its foremen assign a special code number in the 700 series to all extra work or effort that they judged to be caused as a result of the changed condition affecting the unclassified excavation work in general; that the plaintiff then in addition offered to allow the defendants to examine its records daily; that the Resident Engineer conceded that plaintiff kept good daily cost records on this project both before and after the notice of the claim for changed condition; that these daily cost records that plaintiff kept were fully detailed as to what equipment was working, what type of work it was doing, and how long on an hourly basis it was doing this work; that the Resident Engineer never told the plaintiff that any other method of record keeping would be required or that plaintiff's method was unacceptable; that the plaintiff at the October 2, 1973 meeting further afforded to supply the defendants computer print-outs of its general excavation costs on a weekly basis which were based on the daily time and equipment records kept by the job foremen; but, that the defendants after the aforesaid meeting and during the remainder of the work on the project, neither requested these cost print-outs from plaintiff nor did the defendants thereafter review the daily reports of the foremen; and, that the defendants then did not agree that cost records should be kept on all the unclassified excavation work on a force account basis.

(14) In addition to the foregoing testimony of the defendants' Resident Engineer, which this Court finds to be pertinent facts in this case, the documentary evidence and testimony of the other witnesses for both parties. both confirmed and supplemented the testimony of the Resident Engineers.

(15) From early in the project, the plaintiff was required to resort to the "sandwiching" method of constructing all embankment fills. The plaintiff proceeded with this unconventional and unbalanced method and manner of constructing the embankment fills in a good faith intent to complete the project at his bid price notwithstanding those adverse and unexpected subsurface conditions which were aggravated by the substantial monthly rainfall which occurred on the project. The plaintiff's originally expected progress and costs were considerably affected by these unexpected subsurface conditions requiring this unconventional method and manner of construction, but his operations were not initially paralyzed. To combat these unexpected adverse conditions, the plaintiff added to his original spread and complement of grading equipment two large draglines with accompanying mats, and two tandum powered, twin-engined, double-barreled scrapers. These draglines were required because the soil materials to be excavated from the cuts were quite often too unstable and wet to be excavated by more conventional earth moving equipment. In addition, once excavated, because of the wet grades the more conventional earth moving equipment would quite often become stuck. Accordingly, these two tandum powered scrapers were used to haul earth on the wet grades which the more conventional scrapers could not.

(16) By June, 1973, and notwithstanding the differing site conditions which the plaintiff had encountered and been combating since almost the beginning of construction, the plaintiff's overall actual progress was ahead of the original progress schedule and his excavation work in the western two mile portion of the project with an intermediate completion date of October 1, 1973 was approximately 90% complete. At this time, however, it became abundantly

Groves & Sons v. State

clear to both the plaintiff and the defendants that the plaintiff had exhausted all available rock excavation with which to construct the remaining fills in the western portion of the project. In addition, the only significant source of earth material available to complete his fills was the cut material remaining in place in Black Gap in the approximate amount of 100,000 cubic yards. Yet excavation on this cut had already begun and it was obvious to all parties that this material, even with the sandwiching of rock, was unsuitable for use in the remaining fills. This material, in its natural and undisturbed state and without rain, was nothing more nor less than *mud* for all practical purposes. Accordingly, the plaintiff advised the defendants that any further progress in this portion of the project would be virtually paralyzed *unless* the plaintiff were allowed to *waste* the unsuitable Black Gap material and *borrow* other earth material and rock from outside the planned construction limits with which to construct the remaining fills and backfill undercut in this area which would be necessary although not shown on the plans. The defendants initially said "no," and insisted that this portion of the project had to, in effect, be completed with the remaining materials available within the construction limits, and that this Black Gap material was "suitable" for construction because the construction documents indicated them to be suitable. As a result of this unwise position taken by the defendants, the plaintiff's work could not proceed. Finally, in the middle of July, 1973, the plaintiff advised the defendants that it *had to borrow* earth and rock material for the completion of the fills and undercut in the first phase. The defendants then impliedly agreed that this had to be done notwithstanding contract indications to the contrary, but the defendants still insisted that it would have to be done at the plaintiff's expense with no additional compensation to be forthcoming from the defendants. The plaintiff protested and informed the defendants that it would file a claim for payment as borrow. Accordingly, the defendants made the necessary cross-section computations to determine the quantity of borrow material which might be involved in the claim. Shortly thereafter, the plaintiff formally notified the defendants in writing of its claim for

having encountered a differing site condition from the beginning of the project.

(17) That because the plaintiff had initially reached this impasse with the defendants in June, 1973 with respect to the work remaining in the western portion of the project, the only other place available for working its equipment was on the eastern portion of the project where a large cut full of rock existed at Winding Stair Gap. Accordingly and at the insistence of the plaintiff, the defendants finally de facto waived the contractural (sic) requirements with respect to erosion control and allowed the plaintiff to concentrate his work and equipment where the necessary rock could be uncovered and some progress could be achieved. The contract documents had indicated that the earth material on the western side of the cut at Winding Stair Gap would be suitable for use in the fills west of this cut. If this had been the case as had been anticipated by the plaintiff, then the excavation and hauling of these materials to the fills could have proceeded in a westerly direction on a downhill grade. But this earth material in the western side of Winding Stair Gap cut were also discovered to be excessively wet and unsuitable, so the plaintiff for the most part had to leave these materials in place, construct a haul road over them out of rock taken from the eastern side of Winding Stair Gap, and proceed to haul rock on a "cross-haul" basis from the eastern side of Winding Stair Gap to the fills west of Winding Stair Gap. Accordingly, rather than hauling suitable fill material over a suitable downhill grade from the western side of this cut to the westerly fills, the plaintiff was forced to excavate and haul rock from the eastern side of this cut, along an uphill grade consisting of excessively wet and unsuitable materials, and then down through an even more excessively wet and unsuitable grade. Because the grade materials were so unsuitable and unstable, the plaintiff was constantly forced to expend considerable time and effort in just maintaining the haul roads over the grades so that it could achieve at least minimum progress, albeit, unexpectedly expensive.

(18) That finally in late October, 1973, the defendants realized that it had to accept what the plaintiff had been

telling it since June, 1973, namely, that if the western two mile portion of the first phase of the project was ever to be completed, then the unsuitable cut materials remaining in Black Gap would have to be wasted on a complete and massive basis and the underlying foundation material undercut. The defendants were five (5) months late in accepting this reality, however, and had already prevented the plaintiff from utilizing the best five weather months that ever occurred during the life of the construction project in which to accomplish this slow and expensive work involved in the wasting, undercutting, and backfilling earth material from Black Gap. Accordingly, and as a result of the defendants' own failures to accept these realities until it was too late, the plaintiff's operations were forced into the winter and summer of 1974 in order to complete the excavation and undercutting of this unsuitable waste material in Black Gap and the completion of the adjacent fills which was dependent on the foregoing operations. And, since the base stone course and subgrade could not be placed and finished paving begun until this excavation undercut and embankment work was completed, the plaintiff could not complete the western two mile portion of the project until September 29, 1974 as opposed to the contractural (sic) prescribed intermediate completion date of October 1, 1973.

(19) That as if these unexpected and unanticipated problems the plaintiff had encountered with respect to the grading operations in Black Gap and Winding Stair Gap during the summer and fall of 1973 had not been enough, a minor slide of a fill under construction east of Winding Stair Gap occurred on October 4, 1973. While this slide was "minor" in degree, it was extremely major and critical in nature. This slide confirmed what the plaintiff had been telling the defendants from almost the inception of construction, namely, that the designers of this project obviously had not anticipated nor taken into consideration the excessively wet subsurface conditions and the unstable soils required to be used in the fills.

That prior to this slide having occurred east of Winding Stair Gap various other slides had occurred on various cut

slopes throughout the project since early in construction. These slides were as a direct result of the excessively wet and unstable materials as contained in the cut areas in their natural and undisturbed state being incompatible with the slope designs shown in the plans. When this particular slide occurred in this fill section east of Winding Stair Gap, however, it was obvious to the plaintiff and defendants that this design deficiency could not be corrected on a permanent basis merely by clearing up the slide area and beginning the fill again. Accordingly, the defendants suspended plaintiff's operations in this area, and the plaintiff retained three (3) experts in soils mechanics engineering, and undertook an extensive exploratory drilling program to determine if the larger fills in this area were going to be subject to further slides in the future if the plaintiff continued to build these large fills as designed.

That as a result of the exploratory work and the in-depth analysis made by the plaintiff's expert consultants, the results and conclusions of which were afforded the defendants, the defendants accepted the plaintiff's advice and undertook a substantial redesign of the remaining portion of the project east of Winding Stair Gap. When the defendants submitted this redesign to the plaintiff for his cost analysis and bid price, the plaintiff quoted a price of approximately $5.5 million just to finish this eastern portion of the project as redesigned. Of course, prior to the suspension of its work in this area and the redesign, this same eastern portion of this project had been included in the plaintiff's overall bid of approximately $5.3 million. At the time plaintiff quoted this price for the redesigned work, the plaintiff had its same expert consultants review the redesign, and they all agreed that even the redesign would fail. The defendants' own experts subsequently agreed with the plaintiff's experts' reasoning again, and this remaining portion of the contract was then cancelled.

That the portion of the contract that was cancelled was subsequently relet after design changes were made and the contractor who was awarded the work bid $1.70 per cubic yard for unclassified excavation, his price being in excess of

twice the amount plaintiff bid on the original project in that the soil conditions were then known.

(20) That ultimately, the plaintiff was only required to finish and pave that western two mile portion of the project from Station 1029+04 easterly to Station 30+00. From Station 30+00 easterly to Station 114+00 on the western side of Winding Stair Gap, the plaintiff was only required to bring the embankments to rough subgrade, and this area was seeded and grassed.

(21) That this highway project was a 50% federally funded project. Accordingly, when the final cost of this plaintiff's work was known, the defendants had to transmit a justification to the federal government of any and all cost underruns or overruns. The following are significant items of underruns and overruns and the accompanying reasons stated by the defendants' Project Resident Engineer for the cause of the same.

Each overrun and underrun was directly or indirectly related to and a significant indication of the unexpected subsurface conditions encountered involving extremely wet and unstable soils and unexpected drainage problems. These overruns and underruns became strikingly significant when it is taken into consideration that they occurred when less than one-half of the project was finally completed and only approximately 2/3 of the project was rough graded while the underruns and overruns as indicated are based on quantities originally planned for the entire project:

(a) *Unclassified Excavation:* Original amount: 4,267,000 cubic yards; Final amount: 2,670,742 cubic yards; Quantity underrun: 1,596,258 cubic yards. *Reason:* "The discovery of unstable embankment conditions between Station 114+00 to Station 194+00 resulted in the suspension of work in this area and the subsequent partial deletion of unclassified excavation."

(b) *Drainage Ditch Excavation:* Original amount: 15,000 cubic yards; Final amount: 31,008 cubic yards; Quantity overrun: 16,008 cubic yards. *Reason:* "A

large number of silt basins were excavated and re-excavated several times during the life of the project causing the overrun."

(c) *Undercut Excavation:* Original amount: 2,150 cubic yards; Final amount: 26,176 cubic yards; Quantity overrun: 24,026 cubic yards. *Reason:* "During construction a much greater amount of unsuitable material was encountered and had to be removed than was originally anticipated."

(d) *Coarse Aggregate Base Course, Stabilization of Sub-Grade:* Original amount: 5,450 tons; Final amount: 10,526.75 tons; Quantity overrun: 5,076.76 tons. *Reason:* "The roadbed was stabilized from Sta. 1026+00 to Sta. 30. Original calculations called for 40% of the area to be stabilized. Also, the rate of stabilization was increased in certain fill areas."

(e) *Proof Rolling:* Original amount: 38 hours; Final amount: 7.9 hours; Quantity underrun: 30.10 hours. *Reason:* "The discovery of unstable embankment conditions between Sta. 114+00 to Sta. 194 resulted in the suspension of work in this area. . . Also, proof rolling was deleted on portions of the project between Sta. 1026 to Sta. 30."

(f) *Underdrain Excavation:* Original amount: 3,800 cubic yards; Final amount: 4,590 cubic yards; Quantity overrun: 790 cubic yards. *Reason:* "During construction extremely wet subsurface conditions were encountered which required the extensive use of underdrain."

(g) *Underdrain Fine Aggregate:* Original amount: 1,900 cubic yards; Final amount: 1,589 cubic yards; Quantity underrun: 311 cubic yards. *Reason:* "During construction extremely wet subsurface conditions were encountered which required the extensive use of underdrain."

(h) *Perforated Pipe, Underdrain:* Original amount: 6,800 l.f.; Final amount: 15,085.7 l.f.; Quantity overrun: 8,285.7 l.f. *Reason:* "During construction extreme-

ly wet subsurface conditions were encountered which required the extensive use of underdrain."

(i) *6" Pipe Wyes, Underdrain:* Original amount: 63 ea.; Final amount: 2 ea.; Quantity underrun: 66 ea. *Reason:* "Because of the type of drainage problems encountered not so many were needed as was originally calculated."

(j) *Concrete Spring Boxes:* Original amount: 6 cubic yards; Final amount: 2.93 cubic yards; Quantity underrun: 3.07 cubic yards. *Reason:* "Because of the nature of the drainage situations encountered, spring boxes could not be utilized at all locations called for on the plans."

(22) That this transmittal of explanation of underruns and overruns by the defendant to the federal govenment was not forwarded nor made available to plaintiff by the defendants prior to this lawsuit.

That in reviewing the overruns and underruns set forth above, along with the defendants' Resident Engineer's descriptions of the causes, it becomes convincingly clear that the wet subsurface conditions were certainly not anticipated by the defendants prior to the award of the contract. This was the case notwithstanding the fact that the defendants supposedly expended some two (2) years prior to the award of the contract conducting an in-depth subsurface exploration and investigation to determine the condition of the subsurface soils so as to inform themselves and prospective bidders of the likely subsurface conditions to be encountered. As confirmed by the design of the project and the defendants' own engineer's estimate for performing the work, however, the defendants anticipated no great problems with respect to the stability of the subsurface soils to be encountered.

(23) That the most revealing unanticipated overrun in quantities is that of the undercut of unsuitable materials which had originally been estimated by the State prior to bids to involve only 2,150 cubic yards. The final quantities of unsuitable materials which were undercut and wasted

was 26,174 cubic yards or a 1200% overrun as shown and even these figures are vastly misleading, however. In point of fact, this overrun occurred when only approximately 2/3 of the project as originally planned was rough graded. Furthermore, the greater portion of this overrun occurred in the cut section of Black Gap where the defendants' plans and subsurface investigations indicated no undercut whatsoever. In this same cut, the plaintiff was also required to waste as unsuitable most all of the material above that which was undercut because it had the same properties and nature of that which had to be undercut below the planned grade. This material amounted to approximately 100,000 cubic yards. Accordingly, when added to the overrun figure labeled as "undercut" in the Resident Engineer's final estimate, the true "undercut" quantity for the project would be approximately 126,000 cubic yards, or an overrun of 5860% in terms of known unsuitable material which had to be wasted. Furthermore, based on the defendants' Resident Engineer's own records there were various other quantities of unsuitable material which had to be wasted from different cuts throughout the project.

(24) That the second most revealing overrun shown above was that of the Coarse Aggregate Base Course used for the stabilization of the subgrade. As shown, the defendants originally anticipated only having to use this stabilization for approximately 40% of the 5.4 mile project, and even then with the use of only 5,450 tons. In point of fact, however, the only stabilization used was in the first phase of the project, or first approximate two (2) miles, and in order to stabilize this subgrade, 10,526 tons was required for the entire roadbed. Stabilization of the rough subgrade from the end of the first phase at Station 30 easterly to the western side of Winding Stair Gap was not attempted as this section was left at rough subgrade.

The subsurface Report made available to the plaintiff prior to the bid stated: "Soils should pose no great problems on this project except perhaps requiring some stabilization in the elastic A-5 soils." As testified to by the defendants' Resident Engineer, this "stabilization" referred to in the foregoing statement meant the use of the Coarse Aggregate

Base Course referred to above. Contrary to what was indicated in the Subsurface Report, however, the "some stabilization" referred to therein was a gross understatement in that for the only segment completed, the entire roadbed had to be stabilized and at a rate and use of stabilization stone twice that shown in the plans to be necessary for the entire project.

Again, the foregoing is directly indicative of the unanticipated inability of the plaintiff to be able to compact the soils according to the original contract requirements and indications. Because these soils were unexpectedly excessively wet in their undisturbed state in the cut areas, and they could not ever be dried sufficiently for proper compaction, the "sandwich method" of construction had to be used and massive course base aggregate stabilization substituted for the compaction efforts which proved to be futile.

As further evidence of the foregoing, the defendants ultimately waived all compaction requirements of the contract, ceased running density compaction tests as would have otherwise been required, and ultimately directed the plaintiff to delete proof rolling of the finished subgrade. In this regard, the plaintiff was directed to proof-roll and thus test the compacted stability of the first finished subgrade in the middle of October, 1973. All these tests failed, and according to the terms of the contract, the areas that failed were to be re-shaped and compacted according to contract specifications and re-tested by repeated proof rolling at plaintiff's expense. The defendants, however, being fully aware that compaction was and had been impossible as proven by these proof rolling failures, then deleted any further proof rolling requirements.

(25) That subsequent to the defendants' stop work order in early October, 1973, concerning any work east of Winding Stair Gap, it became apparent that the defendants' design was deficient and inadequate due to the unforeseeable and unexpected conditions the plaintiff had encountered some five to six months earlier, i.e., extremely high moisture content in the in place subsurface soils. It was determined that not only were these soils unsuitable for embankment

but were unstable in their natural state and proposed fills could not support additional material from cut areas. As a result of these differing site conditions and deficient design the remaining portion of the contract was cancelled. That upon cancellation of the remaining portion of the project, the defendants under the terms of the contract were required to reimburse the plaintiff for certain costs inherent in the underrun of the unclassified excavation quantities resulting from the cancellation of the project. These costs were strictly related to the cancellation and accompanying underrun of unclassified excavation and in no way related to the extra costs the plaintiff had incurred as a result of the differing site condition prior to the cancellation.

With respect to the underrun in quantities resulting from the cancellation, the defendants paid to plaintiff One Hundred Seventy-six Thousand Two Hundred Sixty-eight and 97/100 ($176,268.97) Dollars. In addition and as a further result of this cancellation and underrun, the defendants paid the plaintiff the sum of One Hundred Ninety Thousand Five Hundred Ninety-three and 21/100 ($190,593.21) Dollars for unabsorbed overhead costs which the plaintiff could not recover by being unable to complete the quantities as planned. Finally, the defendants also reimbursed the plaintiff for its exploratory drilling costs in the amount of Thirteen Thousand Two Hundred Fifty-six and 72/100 ($13,256.72) Dollars which had established the defendants' defective design of the project. What the defendants paid to the plaintiff related strictly to the cancellation and underrun of quantities, however, what the defendants failed to pay was the plaintiff's unabsorbed expenses of unexpectedly having to demobilize its equipment and transporting it back to its home office shop in Charleston, West Virginia rather than being able to send it to another project as theretofore planned. These unabsorbed extra costs not paid by the defendants but caused by the unexpected cancellation of the work caused by the differing site conditions, amounted to Thirty-one Thousand Twenty-six and No/100 ($31,026.00) Dollars.

(26) That based on the testimony of two expert witnesses

presented by the plaintiff, namely, Dr. C. Page Fisher, Jr., a consulting engineer and renowned specialist in soils mechanics and foundations, and Francis L. Holloway, an engineer and specialist in soils mechanics and renowned cost analyst dealing with the impact of soils problems, both of whom investigated the site while the project was being built in the fall and winter of 1973 and 1974, this Court makes these additional findings of fact:

(a) That soil borings had been made in cut areas during the middle of September, 1973 to determine the in place moisture content of the cut materials in their natural and undisturbed state; that these borings were made by Pittsburgh Testing Laboratories at the request of another expert soils mechanics consultant retained by the plaintiff to assist in resolving the soil problems; that this consultant investigated the site also, but has since died; that those borings obtained at his direction and their then existing natural in place moisture content were representative of the condition of most of the materials which were excavated from the cut areas and used in embankment fills or wasted during the life of the project; that these borings, along with the two experts' analysis of the same in conjunction with their personal examination of these materials being excavated and used in the fills which they observed while in the project during construction, substantiated that most of the soil materials excavated from the cuts and used in the fills or wasted during the construction of this project were unsuitable for use in fills in a practicable manner by conventional compaction techniques; that these materials were unsuitable for such use because they had an excessive natural moisture content while in their undisturbed natural state in the cut areas; that this same subsurface condition of these soils existed before bids and could not have been determined by any reasonable examination of the noticeable physical conditions of the project site prior to bidding; but, rather, their condition could only have been determined by a lengthy and costly subsurface

**Groves & Sons v. State**

exploratory program whereby the actual moisture
content of these soils could have been determined and
reported; that the degree of the natural moisture con-
tent of these soils could have been determined and
reported by the defendants from the very subsurface
borings they made prior to bids with very little added
expense or trouble, but such information does not
appear in the contract subsurface report given to the
plaintiff and other bidders; that the contract docu-
ments, including the subsurface investigation report,
available to the plaintiff as well as other bidders prior
to bids in no way indicated the real unsuitable nature
of these soils or the high natural moisture content of
these soils; that while the soil subsurface report did
indicate that some of the cut materials would be
"moist", "damp" or "wet", this in no way indicated
that these soils would pose any considerable problem
or that the soils could not be dried, compacted and
used according to contract specifications and in a
practicable manner and within the contract time lim-
its; that these soils in their undisturbed natural state
would appear sound but when disturbed by construc-
tion equipment would have and did have the quality
and tendency of turning into a viscous fluid; that the
density and compaction tests conducted or not con-
ducted during the course of construction evidenced
the foregoing; and, that the plaintiff built and stabi-
lized both the cut and fill areas by the only method
possible since compaction of these soils could not be
achieved, namely, using the "sandwich method" of
constructing the fills; that this method of perfor-
mance, while dictated by the actual conditions
encountered after the project began, was in no way
indicated to be necessary or specified in the contract
documents.

(b) That in the considered opinion of these two ex-
perts, based on their review of the contract docu-
ments, their review of actual job records, and in parti-
cular, their review of the actual job conditions while

the project was being built, the plaintiff encountered shortly after beginning construction on this project and during the progress of the work actual subsurface conditions at the site which differed materially from those conditions indicated in the contract, which conditions the plaintiff could not have discovered by a reasonable examination of the site; and, that these changed conditions necessarily caused a material increase in the plaintiff's cost of performance of all unclassified excavation work required for the construction of this project over that which would have reasonably been expected based on the contract documents.

(c) That while the project area did have a significant amount of normal annual rainfall, the rainfall which occurred during the life of this project merely posed a minor aggravation to the major problem; that the soils in their natural undisturbed state were too wet to handle according to contract requirements even with a minimum rainfall; and, that as clear and convincing evidence of the foregoing, during the months of June through October, 1973, the project experienced exceedingly less rain than was normal for those months and for any months in that area, yet the plaintiff's production was minimal and limited to the construction of fills only when it had a source of rock.

(27) That the plaintiff's job superintendent (now no longer employed by the plaintiff) who was on the project throughout the construction testified and used Plaintiff's Exhibit 22 to illustrate his testimony and based on said testimony the Court finds as follows:

That Exhibit 22, introduced and received in evidence was a "profile" of the project reflecting the heights of cuts and depths of fills. That a normal construction operation as was indicated in this contract, would have allowed the plaintiff to move the material from the closest cut to the nearest fill. At the beginning of the job in the summer of 1972 this was possible because the material from the initial top of the cuts was relatively dry but also was comprised of rock as well as soil, a mixture which could be used for embankment; however, subsequent to the winter shut-

down of February and March, 1973, the plaintiff encountered extremely wet material which could not be utilized because the moisture content of the soils was so great that compaction was impracticable, if not impossible. That this site condition required the plaintiff to disrupt its normal construction operation by having to move men and equipment from one area to another in an attempt to allow the excavated material to dry so it could be used; however, when equipment was returned to these same areas the weight of the equipment would cause the material to pump, and water was again forced to the top of the working area thereby causing total disruption again. That the plaintiff was thereby restricted and prevented from making reasonable hauls, in fact, the plaintiff was required to move approximately one and one-half miles to Winding Stair Gap to uncover rock in order to sandwich the fills. That this was not only necessary to build up the embankment but was necessary to allow the movement of equipment through the fill areas. That the plaintiff's equipment constantly mired up and became stuck in the fill areas which further disrupted the work. That the plaintiff continually requested the defendants to allow the wet material to be wasted and replaced by borrow material that could be properly used in embankments, but these numerous requests from the plaintiff to the defendants from June, 1973 until October, 1973 were denied, the defendants contending the material was not unsuitable.

That the plaintiff in an effort to move material over the wet fills even sought to haul half loads which was more expensive and a much slower operation, and resorted to the use of draglines resting on huge mats to remove the wet material from the various cuts.

That the plaintiff had more than enough equipment on the project to complete the first phase on time or October 1, 1973, and even had planned a night operation but the wet materials encountered and required by the defendants to be used prevented the plaintiff from complying with the intermediate completion date; in fact, the plaintiff was ninety percent (90%) complete with the first phase of the project in June, 1973.

That the rain during the construction did not affect the

soils except when drying was attempted. That cuts are graded on an angle which allows rain to drain off and any rain that was absorbed does not disrupt normal working conditions since this top two or three inches of wet material can be bladed off and dry soil again encountered.

That a site inspection would not reveal the wetness of the subsurface soil since the first six to twenty feet of cut material was usually suitable material; but, that the material below this suitable material contained a high moisture content that prevented the plaintiff from using it as embankment material in a practicable manner when the contract documents specified all material was suitable and surplus material was to be compacted in the future eastbound lane.

That the plaintiff's former job superintendent testified further as follows:

(a) The expense of grading major portions of the project was materially greater than would have been the case if the natural moisture content of all of the soils had been at or about optimum as determined by the Proctor test.

(b) The contract required the material excavated from the cuts to be used for building the fills.

(c) The presence of soils with moisture contents materially greater than optimum affected the embankment costs as well as the excavation costs.

(d) Excavation of the soils from the cuts, the transportation and placement of such in fills, and the attempted compaction of such materials tended to turn them into mud and to cause them to lose strength.

(e) The soils were frequently too muddy for the successful operation of any type of equipment.

(f) Operations in mud increased the wear and tear on the equipment, and thus led to higher costs.

(g) Cuts at times had to be excavated in piecemeal shallow layers, so the freshly uncovered material would have an opportunity to dry before being removed.

(h) Material placed in the fills often had to be left undisturbed for days while it was undergoing further drying and was regaining the strength lost through handling.

(i) Constant and disruptive moves of men and equipment from one cut or fill to another was necessary in order to keep the job going.

(j) Attempts to obtain the requisite degree of soil density by rolling each newly placed layer of embankment, without tilling or resting the material, was unsuccessful more often than not. Yet, tilling and rolling the material quite often made it more unstable.

That the plaintiff's job superintendent who has had many years experience in mountain road construction in West Virginia has never encountered any material that compared to that encountered on this project in Macon County. That plaintiff's job superintendent also used 8mm color film taken September 16, 1973 to illustrate his testimony which reflected the extremely wet material, deep ruts in the fill area from equipment, the use of draglines, and massive drainage ditches constructed by the plaintiff which did not and could not significantly drain the water from the material being excavated.

That subsequent to August 15, 1973, the date of plaintiff's claim letter, a meeting was held on the project site among employees of the plaintiff.

At this meeting during the latter part of September, 1973 or early October, 1973 the job foremen of the plaintiff were instructed to keep separate records for normal conditions and conditions as were being encountered.

That the plaintiff had always during this project maintained detailed daily labor and equipment reports. That the daily reports reflected the total hours of all equipment and labor for a particular day and reflected what the men and equipment were actually doing, i.e., unclassified excavation, force account, blasting, etc. That the foremen and the job superintendent were instructed to use their judgment from experience in analyzing what work could have been

accomplished during the same period under normal conditions, thereby arriving at the hours equipment and men were actually engaged in the changed condition separate and apart from the total hours of men and equipment recorded daily. Additionally, if two pieces of equipment were required to accomplish what one could have done under normal conditions, then one-half of the equipment was charged to the changed condition.

That these daily labor and equipment reports, fourteen (14) volumes, were reviewed each night by the job superintendent for their accuracy.

That these daily reports are extremely important to plaintiff because they tell him how to bid his next project, i.e., what can be accomplished by a certain number of men and equipment in a given period.

(28) That Dallas L. Wolford, Vice President of the plaintiff, identified the plaintiff's verified claim letter of October 6, 1975 addressed to Mr. Billy Rose, State Highway Administrator, said claim letter being identified as Tab 43 of Change Condition Section of Plaintiff's Exhibit 15 which was received in evidence. From the testimony of Mr. Wolford the Court finds as follows:

That Mr. Wolford reviewed the plaintiff's verified claim letter in detail which outlined the plaintiff's claim and the reasons therefor. That the plaintiff's claim letter of October 6, 1975 was in accordance with and complied with North Carolina General Statute 136-29.

That the plaintiff in its claim letter and for the purposes of this action claimed the following as due it for conditions encountered at the project site that differed materially from those anticipated by the contract documents and which a reasonable site investigation would not reveal:

(a) Extra cost of demobilization in the amount of Thirty-one Thousand Twenty-six and No/100 ($31,026.00) Dollars caused by the changed condition. That normally this cost is charged to a new job but this project was cancelled prior to completion thereby requiring the plaintiff to unexpectedly have to ship

and store its equipment at its area shop in Charleston, West Virginia rather than to another job, said costs being incurred from freight, loading and unloading, and lowbay operations.

(b) Cost of rock borrow as a result of the changed conditions in the amount of Eighty-two Thousand One Hundred Thirty-nine and 24/100 ($82,139.24) Dollars. That this rock material was used to replace the removal of unsuitable undercut material in cut areas and was used to construct portions of the adjacent fills which was not a conventional method of construction. That the defendants by Supplemental Agreement No. 4 established a price for rock borrow and in fact, paid for a portion but not for all rock borrow necessary to build the embankments.

(c) Extra costs related to unclassified excavation incurred as a result of the changed conditions in the total amount of One Million One Hundred Seventy Thousand Two Hundred Seven and 26/100 ($1,170, 207.26) Dollars which included waste excavation from Black Gap and cross-hauling of rock from Winding Stair Gap. In substance, the extra costs of unclassified excavation arose from plaintiff having to use material from cut areas extremely distant from the fill areas in order to have sufficient rock to bring embankments to grade which forced the plaintiff to maintain long haul roads, obtain select material, haul over adverse grades and increase its hauls during the worst construction season. In general, the unclassified excavation change condition claim was calculated and based on the following conditions encountered:

    a. Unsuitable material
    b. High water table
    c. Move in 2 large draglines
    d. Install wide tracks on dozers
    e. Bring in tandem powered scrapers
    f. Use only rear dump trucks with non-spin differentials

g. Unusual number of large springs

h. Rock borrow to get fill started

i. Under cut of 6' in narrow cut

j. Material could only move one direction to waste area thru two bad fill sections

k. Rock borrow for haul road

l. Adverse 6% grade - for return and borrow

m. Narrow waste area - caused rehandling

n. Overrun in excavation and underdrain

o. Draglines had to work on mats

p. Additional time required to perform overrun quantities

(d) Liquidated damages withheld of Fifteen Thousand Five Hundred and No/100 ($15,500.00) Dollars.

That the completion date of October 1, 1973 for the first phase of the project would have been met by the plaintiff had it not encountered the changed condition and been granted the proper extensions of time.

That the defendants did not demand or request in writing that the plaintiff furnish a cost breakdown on its verified claim prior to the claim hearing but on the contrary had theretofore informed the plaintiff that keeping of records on the changed condition would be of no benefit.

That the defendants ignored the opportunity to review the record keeping of the plaintiff after changed conditions notice of August 15, 1973.

That change condition cost was set up particularly for the project after August 15, 1973, and although the defendants were informed records were available, no review or inspections were ever made by the defendants after October 2, 1973.

(29) That on August 15, 1973 the plaintiff afforded the defendants ample and written notice of this differing site condition claim; that both prior to that date and subsequent to that date, the plaintiff maintained daily cost records of the cost of performing its unclassified excavation work which substantially complied with the contract requirements relating to cost of work affected by any changed

condition; that these daily cost records recorded in detail on an hourly and daily basis what equipment was being operated, by whom, performing what aspect of the unclassified excavation work, and the locations on the project where they were working; that as to their details, these cost records maintained by the plaintiff exceeded the force account requirements; that these cost records maintained by plaintiff were available throughout the project to the defendants for their review both prior and subsequent to August 15, 1973; and the defendants were given the opportunity to supervise and review the keeping of these records as is done in force account work; but, that notwithstanding the plaintiff's written notice and claim of a changed condition to the defendants on August 15, 1973, the defendants thereafter failed to promptly respond to the plaintiff's claim and, in fact, even encouraged the plaintiff not to keep such cost records as to the unclassified excavation work in general; that the defendants thereafter did not avail themselves of the opportunity to supervise and check the cost records because they did not agree that the plaintiff had encountered a changed condition under the terms of the contract; and, that the defendants had been aware of the conditions of which the plaintiff complained for a considerable time prior to August 15, 1973, so an investigation by the defendants of such changed conditions as claimed would have served no useful purpose.

(30) That the actual cost of the plaintiff performing its unclassified excavation work after August 15, 1973, was computed in the following manner and according to Force Account Method of Payment as established in the contract:

(a) The payrolls of those laborers and foreman working in the unclassified excavation work were given to the defendants weekly throughout the job. The hours in any given day that a named laborer or foreman was working on unclassified excavation work were recorded in the plaintiff's daily records which were available to the defendants as heretofore stated. These hours could be and were matched and cross-referenced from the weekly payrolls and the daily reports. Since the wage rate of each named laborer or

Groves & Sons v. State

foreman was accounted for in the payroll reports, and since the hours each named laborer worked on the unclassified excavation work was recorded in the foreman's daily reports, the compilation of the total labor costs related solely to the unclassified excavation work was compiled from August 15, 1973 until the completion of the unclassified excavation work.

(b) The hours each piece of equipment was performing the unclassified excavation work were recorded daily on the daily reports. If any given piece of equipment only operated a certain number of hours each day, then the operating hours were recorded separately from the hours that equipment was idle during the day. In computing the total equipment cost as per Force Account Requirements, the plaintiff applied the rental rates as specified by the applicable schedule published by the Associated Equipment Distributors. The equipment rates were charged on an hourly basis applying 1/176th of the applicable AED monthly rate for each hour of operation on unclassified excavation work. This method was used since some equipment was used on items other than unclassified excavation work during a given month and some equipment was working night shifts as well as day shifts which is not contemplated nor provided for in the applicable AED monthly schedule.

(c) The only materials used and charged as per force account requirements in the computation of the unclassified excavation work after August 15, 1973 was blasting materials for the excavation of rock.

(d) Equipment and labor time used and charged in the rock borrow operation was kept separately and not included in the unclassified excavation work account.

(e) Based on the foregoing, the total cost of the plaintiff's unclassified excavation work performed after August 15, 1973 was accounted for as follows and as per the dictates of the Force Account Work requirements of the contract:

Groves & Sons v. State

| 1. Total Labor | $268,628.85 | | |
|---|---|---|---|
| Plus 30% | 80,586.50 | $ | 349,208.41 |

2. Bond, Insurance & Taxes:

| | | |
|---|---|---|
| FICA | 5.85% | |
| N.C. Unemployment | 3.00% | |
| FUTA | .58% | |
| Liability | 3.00% | |

$268,628.85 labor costs x
12.43% = $33,389.70

| | | |
|---|---|---|
| Bond - $641,209.73 at $3.50/ $1000 = | $ | 2,244.23 |
| Total Bond, Insurance & Taxes | $ | 35,633.93 |
| Plus 6% | | 2,138.04 |
| | $ | 37,771.97 |

| 3. Materials | $ 69,240.60 | | |
|---|---|---|---|
| Plus 15% | 10,386.09 | $ | 79,626.69 |
| 4. Equipment | | $ | 1,063,926.20 |

| TOTAL COST | $ | 1,530,533.27 |
|---|---|---|

(f) In arriving at the extra costs the plaintiff incurred in performing its unclassified excavation work as a result of the changed condition, however, the plaintiff computed and allowed the defendants the following credits against these total costs of One Million Five Hundred Thirty Thousand Five Hundred Thirty-three and 27/100 ($1,530,533.27) Dollars:

1. The unclassified excavation quantities performed after August 1, 1973 and for which the plaintiff was paid the contract unit price of $.79/cubic yards: 1,125,756 cubic yards time $.79/cubic yard = $889,323.54.

2. Further excavation work on the project was

cancelled by Change Order 8 which reduce the contract quantities. In connection with this reduction in quantities and this change order, the plaintiff was allowed $176,268.97 because of the increase in his bid unit cost due to the under-run of the unclassified excavation quantities. Accordingly, this figure was pro-rated and allocated based on those quantities performed prior to August 1, 1973 as against those quantities performed after August 1, 1973 to arrive at the proper credit the defendants should be allowed on the increase in the unit price payment made to plaintiff for the quantities of unclassified excavation performed after August 1, 1973. This figure was computed properly as *$84,306.29.*

(g) Thus, the total extra costs incurred by the plaintiff in performing its unclassified excavation work after August 15, 1973, when the proper credits are allowed the defendants is: *$556,903.44.*

(31) That the plaintiff accounted for and presented two other methods of computation of its extra costs incurred in its unclassified excavation work. The first other method presented consisted of the extra labor and equipment time and resulting costs as estimated by them and reached on a daily basis to be the "extra effort" necessitated by the changed condition as to the unclassified excavation work. These estimated "extra effort" costs, recorded from October 1, 1973 until the unclassified excavation work was complete, were reasonably comparable to the actual extra cost incurred from October 1, 1973 until all classified excavation was completed. The remarkable nature of this comparability is that the plaintiff's foremen on daily basis when recording these estimates could in no way know what the ongoing actual costs were or would be since the final quantities and payments and credits could not be ascertained until long after the completion of the project. While this method of computation was subjective in nature and probably not in as complete compliance with the details of force account accounting as the computations accepted by

this Court, the comparability of the final extra costs are a tribute to and substantial evidence of the competence and experience of plaintiff's fore men and their record keeping.

That the second other method of computation of the total extra costs presented by the plaintiff was the same as the one which this Court recognizes except that all equipment was charged on a monthly basis at monthly AED rates and then additional hourly charges were added for that same equipment which engaged in night shift operations. This method would have resulted in the plaintiff being due approximately Sixty Thousand and No/100 ($60,000.00) Dollars more in extra costs related to the unclassified excavation work. Since the applicable AED schedule does not address itself to this question, this court finds that the more logical manner for charging the equipment would be on an hourly basis as was done in the method accepted by this Court. In this way, the defendants could not be overcharged.

That it should probably be noted that the plaintiff claimed and presented evidence that it was entitled to the monthly rental rate cost of equipment based on the applicable AED rates during two (2) months of 1974 when the project was shut down with the knowledge and consent and acquiescence of the defendants. This equipment remained present on the project but was idled for those two months and not used in any unclassified excavation work. The total applicable AED rental for this equipment for these two months was Three Hundred Eighty-two Thousand Seven Hundred Eighty-six and No/100 ($382,786.00) Dollars. This Court finds and concludes that these extra costs are not reimbursable to the plaintiff and, of course, are not included in those extra costs allowed.

(32) That in the middle of July, 1973, the plaintiff advised the defendants that it had to conduct a rock borrow excavation from outside the construction limits in order to complete the fills immediately adjacent to the Black Gap cut and the undercut area in order that the materials excavated from the cut could be hauled over the fill. The defendants agreed that this was necessary for the plaintiff

to do, but alleged that the plaintiff was not entitled to any extra costs for performing this rock borrow operation although acknowledging that the materials from the Black Gap cut were unsuitable and could not be used in the adjacent fills and undercut area which the plaintiff proposed placing this rock borrow into. The plaintiff notified the defendants that it was entitled to the extra cost of this operation over and above the bid price of $.79/cubic yard for unclassified excavation since this was borrow from outside the construction limits. Accordingly and based on the plaintiff's claim, the defendants cross-sectioned the rock borrow area prior to the time the plaintiff excavated this borrow rock from it.

Subsequently, when it became obvious to the defendants that additional rock borrow would be required to complete the substantial undercut remaining to be performed in Black Gap, it directed the plaintiff to do so at a negotiated and agreed upon price of $3.98/cubic yard. A supplemental agreement was entered into whereby the plaintiff was to be paid $3.98/cubic yard for this rock borrow at a stipulated quantity of 5,300 cubic yards. In fact, however, and without another supplemental agreement being entered into, the plaintiff performed at least an additional 6,350 cubic yards of rock borrow after performing the initial 5,300 cubic yards called for in the supplemental agreement, and plaintiff was paid for this additional rock borrow at the previously established price of $3.98/cubic yard. Thus, the plaintiff performed and was paid for a total of 11,650 cubic yards of rock borrow at $3.98 per cubic yard or a total of Forty-six Thousand Three Hundred Sixty-seven and No/100 ($46,367.00) Dollars for this work. For payment purposes, the defendants measured the amount of rock borrow used subsequent to the supplemental agreement by measuring the size of the undercut area rather than measuring the quantities taken from the borrow cut area itself as was provided for in the supplemental agreement and the Standard Specifications of the contract as applies to "Borrow Excavation." This method of measurement in fact used by the defendants was improper and could not have and did not account for the rock borrow placed in the

undercut area which displaced and sunk beneath the undercut grade. Nevertheless, after all rock borrow had been removed from the rock borrow area, all of which rock was used in the undercut area of the Black Gap cut or in the fills immediately adjacent to such cut, this rock borrow area was cross-sectioned by the parties and compared with the original cross-sections which had been made by the defendants in the middle of July, 1973, and these measurements substantiated that a total of 33,688 cubic yards of rock borrow was required to complete the backfill of the undercut in Black Gap and complete the fills immediately adjacent thereto less 1,400 cubic yards used by plaintiff for a haul road from the borrow pit to the fill and adjacent undercut area. Accordingly and as a direct result of there not being sufficient suitable material to complete the Black Gap fills and backfill the undercut area, the plaintiff was required to use an additional total of 20,638 cubic yards of rock borrow in this area but for which the defendants failed and refused to pay him although a contract price was negotiated and established between the parties for these rock borrow quantities. Based on the foregoing, the plaintiff has been entitled to compensation for the additional rock borrow cut area in the amount of 20,638 cubic yards x $3.98/cubic yards, or additional total compensation for rock borrow quantities in the amount of Eighty-two Thousand One Hundred Thirty-nine and 24/100 ($82,139.24) Dollars. The plaintiff is entitled to this additional payment pursuant to the terms of Section 26 entitled "Borrow Excavation" of the Standard Specifications of the contract and the agreed upon price between the parties.

## CONCLUSIONS OF LAW

Based upon the foregoing Findings of Fact, the court makes the following Conclusions of Law:

. . .

3. That the contract documents furnished the plaintiff by the defendants consisting of Standard Specifications, Special Conditions, Plans and Subsurface Information were material representations and indications upon which the plaintiff was justified in relying including but not limited

to, that the unclassified excavation in excess of 4,000,000 cubic yards would be suitable material and practicable to use for embankment construction and that the materials excavated could be used in the fills within the balance points indicated and compacted to meet specifications all within the time limits of the contract documents. Contrary to the foregoing, however, most of the materials excavated were in fact unsuitable and impracticable to use for embankment construction and the excavated materials quite often could not be used within the balance points as indicated in the plans. Rather, the plaintiff had to resort to a "sandwich method" operation of construction heretofore described which included having to excavate both rock and less unsuitable earth materials from areas well outside the balance points as shown and cross-haul these materials throughout the project in order to complete its embankment construction.

4. That the plaintiff made a reasonable site investigation prior to bidding and the condition of the in place soils could not have been discovered by reasonable observable physical factors; that the plaintiff was not required to nor was there sufficient time to make its own subsurface investigation but was entitled to rely on the contract documents prepared and furnished by the defendants.

5. That the plaintiff did encounter subsurface or latent physical conditions at the site differing materially from those indicated in the contract documents which affected all of its unclassified excavation work.

6. That plaintiff encountered for the most part in its unclassified excavation work soils with natural moisture contents considerably greater than the optimum required for compaction, and this was contrary to what the contract documents indicated.

7. That the contract documents pertaining to the method and manner of achieving the compaction requirements constituted positive representations or indications to the plaintiff that the soils to be encountered would have natural moisture contents reasonably comparable to the optimum required for compaction as specified in the contract.

8. That the contract intermediate completion date of October 1, 1973 was not possible to meet under any circumstances as a result of the plaintiff being required to use those soils excavated from the cut areas in the fill areas, which soils were not suitable and practicable for use in embankment construction.

9. That neither the defendants nor their employees acted in bad faith when furnishing the plaintiff the contract documents because they too were unaware of the unsuitable nature of the soils that would be encountered on this project, that both parties were mutually mistaken at the time they entered into this contract as to the conditions that were going to be encountered; and, that this was a mutual mistake of vital facts.

10. That the plaintiff encountered during the progress of the work conditions at the site differing materially from those indicated in the contract, which conditions could not have been discovered by a reasonable examination of the site and which conditions materially affected the cost of all of the unclassified excavation work and which changed condition also required the plaintiff to perform rock borrow work in quantities in excess of that which the defendants have heretofore paid plaintiff. In addition, this differing site condition caused the defendants to cancel a remaining major portion of its contract with plaintiff, and thereby caused the plaintiff to incur demobilization of equipment expenses which it would not have otherwise incurred had not the remaining portion of the contract been unexpectedly and prematurely cancelled.

11. That the plaintiff notified the defendants in writing of this differing site condition by letter of August 15, 1973.

12. That the plaintiff is entitled to an equitable adjustment for additional costs incurred in its unclassified excavation work as a result of the differing site conditions after August 15, 1973.

13. That the records of the plaintiff, and in particular, the daily labor and equipment reports, reflected the number of pieces of equipment on the job, the number of pieces of

equipment operating, the task of each performed on a given day, the length of time each piece of equipment performed. Additionally, these daily reports reflected all laborers' on the job and the hours worked and on what task or operation. That the records maintained by the plaintiff during this project comply with the requirements of the contract prepared by the defendants and even exceeded those requirements. These records were maintained separately as to each item of work performed under the contract and in particular with reference to the unclassified excavation and in particular with reference to the unclassified excavation work. The time and equipment expended in the rock borrow operation were maintained separately and are not included in the costs of the unclassified excavation work.

14. That as a direct and proximate result of the plaintiff encountering differing site conditions the plaintiff is entitled to recover from the defendants as an equitable adjustment the following sums:

| | |
|---|---|
| (a) For unclassified excavation | $556,903.44 |
| (b) For rock borrow | $ 82,139.24 |
| (c) For demobilization | $ 31,026.00 |
| TOTAL | $670,068.68 |

16. That the plaintiff is entitled to recover from the defendants all liquidated damages withheld in the sum of Fifteen Thousand Five Hundred and No/100 ($15,500.00) Dollars.

17. That the plaintiff, pursuant to the contract provision, is entitled to recover interest on the amounts set forth in Conclusions of Law 15 and 16 at the rate of five (5) percent per annum from March 23, 1975.

18. That the plaintiff submitted a verified claim letter and instituted this action all within the times and other requirements specified in N.C.G.S. 136-29.

19. That C. Page Fisher and Francis L. Holloway were witnesses for the plaintiff and testified in this civil action and were recognized by the Court as expert witnesses.

20. That pursuant to North Carolina General Statute 7A-314(d), the Court in its discretion, concludes that the expert witnesses were required to be present during the entire trial of this matter, and as compensation and as allowance to each of the two expert witnesses of the plaintiff a witness fee of Sixty and No/100 ($60.00) Dollars per hour while attending this proceeding and One Hundred Twenty and No/100 ($120.00) Dollars per hour while testifying, such witness fees to be taxed as costs in this civil action. Copies of expert witnesses' statements are attached to this Judgment and incorporated herein by reference.

Upon the findings and conclusions the court ordered that plaintiff have and recover of defendant $685,568.68, with interest at 5% per annum from 23 March 1975 and that defendant pay expert witness fees amounting to $3,120. From the judgment entered, defendant appeals, noting 161 exceptions to the findings of fact and conclusions of law.

*Attorney General Edmisten, by Special Deputy Attorney General Eugene A. Smith and Associate Attorney J. Christ Prather, for the North Carolina Board of Transportation defendant appellant.*

*Nye, Mitchell, Jarvis and Bugg, by R. Roy Mitchell and John E. Bugg, for plaintiff appellee.*

MORRIS, Chief Judge.

Plaintiff appellee has moved for the dismissal of this appeal on the ground that appellant has violated the requirement of Appellate Rule 10(c) that the "grouping of exceptions under given assignments of error" be confined to a single issue of law so far as practicable. The appellant has listed 167 assignments of error based upon 168 exceptions to the findings of fact and conclusions of law in the trial court's order. Although the exceptions and assignments of error have been placed after each issue presented in its brief, appellant, for the most part, has neglected to identify or address them expressly in its argument under each issue. Thus it is virtually impossible to determine whether any exceptions have been abandoned for lack of argument. While we think plaintiff's position is well taken, we have chosen to discuss the questions raised by this appeal on their merits.

From a substantial record, the court made lengthy and detailed

findings of fact. This Court must now determine whether those findings are supported by the evidence and whether they support the trial court's conclusions of law and order. *Graham and Son, Inc., v. Board of Education,* 25 N.C. App. 163, 212 S.E. 2d 542, *cert. den.* 287 N.C. 465, 215 S.E. 2d 623 (1975).

[1]   Defendant has excepted to the trial court's findings that on 15 August 1973 the plaintiff afforded the defendant ample written notice of its claim of a "changed condition" at the work site. Defendant appears to contend that the notice was deficient in that it did not sufficiently detail the nature of the changed condition and the altera- tion in work procedures which would be necessitated.

*In Blankenship Construction Company v. Highway Commission,* 28 N.C. App. 593, 222 S.E. 2d 452, *disc. review denied* 290 N.C. 550, 230 S.E. 2d 765 (1976), this Court construed the notice requirement as contained in § 4.3A of the Standard Specifications for Roads and Structures (hereinafter "SSRS"), stating as follows:

> In order to qualify for additional compensation under Sections 4.3A or 4.4(c), the Contractor is required to furnish the Engineer written notice of the alleged changed conditions. . . .
>
> While the form of the notice -- written or oral -- may not be critical, the content of the notice must satisfy the under- lying purpose of the notice requirement .... In our opinion the purpose of the notice requirement of Section 4.3A is to apprise the Commission of the Contractor's belief that he has encountered "work conditions at the site differing materially from those indicated in the contract" for which he is entitled to an "equitable adjustment."

*Id.* at 607, 222 S.E. 2d at 461. .

We find that the written notice given by plaintiff clearly apprised the defendant of the claim of a changed condition at the work site in compliance with § 4.3A of the SSRS. Plaintiff's letter of 15 August 1973 explicitly advised the defendant of its claim and demand as follows:

> Our contract with you has a changed condition clause. With the schedule demanded and the superior knowledge of

the Highway Commission and its design engineers, the contract was based on the fact that the soils could be compacted. We believe that the excessive moisture in the soils of this project created by excessive rain and other reasons, the drainage characteristics and soil conditions constitute a changed condition requiring that the Highway Commission grant us equitable adjustment and extension of time.

. . .

Pursuant to the specifications and in order to further protect our position in this matter we hereby notify the commission in writing that we are now having and have had since the beginning of this project, a changed condition of which employees of the commission have had knowledge.

In its letter plaintiff further requested a meeting to see if the parties could reach an agreement concerning an equitable adjustment and time extension for a changed condition.

By letter dated 18 September 1973 defendant advised plaintiff that it did not concur with the claim of a changed condition as presented in the 15 August 1973 letter (and as also presented in a joint meeting held 17 September 1973) and denied plaintiff's request for an adjustment in unit prices or for a time extension. This letter is, of course, a written acknowledgment by the defendant that the plaintiff had informed it of the belief that there had been encountered work conditions at the site differing from those indicated in the contract for which the contractor was entitled to an equitable adjustment.

We find nothing in § 4.3A, or in its interpretation by the *Blankenship* Court, which would support the defendant's contention that the contractor in this initial notice was required to spell out in detail the exact nature and extent of the unclassified excavation work it was claiming under a changed condition. At this point in its claim, plaintiff was not required to itemize the fine points and particulars which subsequently would be necessary in the proof of its claim. All that was necessary at this juncture was a "forceful indication of changed conditions and demand for equitable compensation." *Blankenship Construction Company v. Highway Commission*, supra. The plaintiff's letter of 15 August 1973 fully supports the trial court's

finding that ample written notice was provided in accordance with the contract.

[2] Defendant next argues that the trial court erred in granting plaintiff recovery on the basis of "changed conditions" when different theories and claims were presented to the State Highway Administrator. Defendant is correct in its contention that this Court in *Inland Bridge Company, Inc. v. Highway Commission*, 30 N.C. App. 535, 227 S.E. 2d 648 (1976), held that under N.C.G.S. 136-29, a party may not develop theories of recovery in Superior Court *in addition* to those set forth in the claim filed with the State Highway Administrator. However, the defendant's reliance upon the opinion in *Inland Bridge* is misplaced. The Court's decision in that case was based upon the following:

> Plaintiffs' whole claim before the Commission was for misrepresentation. Had they desired to sue under the provisions in the SSRS incorporated into the contract, which provides for claims based on changed conditions, extra work, or reclassification of materials, it was necessary for them to elect to do so prior to the trial in the Superior Court. *Construction Co. v. Highway Comm.*, 28 N.C. App. 593, 222 S.E. 2d 452 (1976).

*Id.* at 547, 227 S.E. 2d at 655.

Unlike the contractor in *Inland Bridge*, in the case at hand the plaintiff contractor did submit in its verified claim letter dated 6 October 1975 a claim for increased compensation due to the encountering of changed conditions. In this letter individual claims were separated into three groups with detailed explanation and supporting data, to wit: contract termination costs; certain excavation costs involving rock borrow, waste excavation, and slide excavation; and costs directly arising from changed conditions and/or defective design. While the tenor of the verified claim is that all categories of increased costs were brought about by the unanticipated conditions encountered, the plaintiff further encompassed the total claim under the last heading of "changed conditions" by the following:

> For the purposes of this claim letter, we will state that the amount involved due to changed conditions and/or defective design and specifications, is $814,494.81 plus any

money not recognized as due the Contractor in other parts
of this letter.

Thus, plaintiff, while identifying and categorizing certain claims for
the benefit of the defendant, made it abundantly clear that any such
claims not recognized in the separate categories as presented were to
be included in the overall "changed conditions" claim. Plaintiff did not
pursue or recover at trial on a theory which had not been previously
presented to the Administrator. Defendant's further contention, that
at trial plaintiff could only attempt to prove its compilation of damages
in the one method presented to the Administrator, we find to be
without merit.

[3]  Appellant's next assignment of error involves a fundamental
question to be resolved in this action: Whether the plaintiff-contractor
in fact and in law encountered "changed conditions" at the work site
so as to entitle it to an equitable adjustment in compensation from
that specified in the contract. Article 4.3A of the SSRS, incorporated
into the parties' contract, provides in pertinent part as follows:

> Should the Contractor encounter or the Commission dis-
> cover during the progress of the work conditions at the site
> differing materially from those indicated in the contract,
> which conditions could not have been discovered by
> reasonable examination of the site, the Engineer shall be
> promptly notified in writing of such conditions before they
> are disturbed. The Engineer will thereupon promptly
> investigate the conditions and if he finds they do so ma-
> terially differ and cause a material increase or decrease in
> the cost of performance of the contract, an equitable ad-
> justment will be made and a supplemental agreement en-
> tered into accordingly.

Defendant appellant does not appear to contest that excessive
moisture and unstable soils were in fact present at the work site as
contended by plaintiff. Abundant evidence was presented at trial of
the existence of excessively wet earth materials which forced plaintiff
to resort to construction of the fills by means of the "sandwich
method" of alternating layers of rock and earth, since the soil would
not dry back to achieve the specified density when compacted.
Furthermore, plaintiff's later difficulty in obtaining rock even to
continue in this time-consuming and expensive method of construc-

tion was essentially unchallenged by defendant. Although defendant initially refused plaintiff's request to waste the unsuitable material encountered in the Black Gap cut, it now admits on appeal that there was no question but that the material was too wet in its natural condition for the construction of roadway embankments. All parties acknowledge that the "cave-in" or "slide" in the eastern project,which was caused by wet and unstable soils, necessitated a redesign of this portion of the project and its eventual cancellation.

Since the existence of the above conditions is not in controversy, the basic issue before this Court is whether this situation constituted "work conditions at the site differing materially from those *indicated in the contract.* " Defendant does not argue on appeal, nor do we find, that the site conditions should have been discovered by reasonable examination of the area.

In essence the trial court concluded from the facts found that the parties were mutually mistaken at the time of bid as to the soil conditions which actually existed. Quoting extensively from the contract, the court found that the presence of these conditions could not have been anticipated from the contract itself. The trial court held that the contract provisions concerning soil types, compaction and proof rolling requirements, and specifications applicable to embankment construction constituted material representations that the soil conditions present at the work site would be suitable for use as indicated. The contract explicitly represented that for the most part "[s]oils should pose no great problems on this project . . . ." Additionally, the implication that no unsuitable material would be encountered was suggested by the deliberate deletion of Section 22, the standard provision which defines what type of material is to be classified as unsuitable. The court further found that the time period of just sixteen months which was allotted for completion of the entire project was an affirmative indication or representation that this work could be accomplished within the time prescribed. Based upon its finding of mutual mistake of fact, the court concluded that the plaintiff was entitled to an equitable adjustment for additional costs incurred as a direct result of the differing site conditions.

We hold the above findings and conclusions of the trial judge to be supported both by the evidence and the law. In reaching our decision we have considered the analysis of other jurisdictions, both federal and state, as well as our own North Carolina decisions, relat-

ing to the interpretation of construction contracts containing the changed condition clause as found in Section 4.3A of the SSRS.

Contract design features, specifications and requirements have been held in several instances to constitute affirmative indications that the job could be accomplished in the manner designated in the contract and completed within the prescribed time limits. *See* Southern Paving Corporations, AGBCA No. 74-103, 77-2 BCA ¶ 12,813 (1977); *Foster Construction C.A. and Williams Brothers Company v. United States,* 435 F2d 873, 193 Ct.Cl. 587 (1970); *Ray D. Bolander Company. Inc. v. United States,* 186 Ct. Claims 398 (1968). The *Bolander* opinion, in considering a differing site condition claim, is particularly instructive as it dealt with detailed contract compaction requirements and other design features similar to those present in the contract now before us. This decision held that the contractor had a valid differing site condition claim based on the positive representations concerning the soil conditions as contained in the contract documents. The Court of Claims stated:

> It would be equally inane to suppose that this article on compaction and all the specifications were in this contract for no purpose.
>
> ... There was a clear implication (or "indication," using the word in the "Changed Conditions" article) that these were soils capable of compaction to [the degree specified in the contract] . . . .
>
> Even assuming, arguendo, that the provision on compaction was not a representation, it was at the very least misleading and ambiguous, and the consequences of that ambiguity are chargeable to the author.

*Id.* at 417.

In *Lowder, Inc. v. Highway Commission,* 26 N.C. App. 622, 217 S.E. 2d 682, *cert. denied* 288 N.C. 393, 218 S.E. 2d 467 (1975), a large overrun in undercut excavation occasioned by unexpected and excessive wetness was determined to constitute a "change condition" within Section 4.3A of the SSRS. In its decision the Court specifically stated that "[i]n our opinion the encountering of unexpected excessive wetness may constitute as much a change of condition as the encountering of unexpected rock." *Id.* at 644, 217 S.E. 2d at 696. The opinion held that certain contract proposals and plans, in this instance the

location and quantity of undercut excavation, may constitute material representations which justifiably can be relied upon by a contractor. When confronted by conditions which significantly differ from those indicated to exist in the contract, the contractor may legitimately seek relief under the "changed condition" section of the contract.

> Where parties labor under a mutual mistake as to vital facts, the contract, in the interests of fairness, should be flexible enough to permit an equitable adjustment.

> The broad purpose of changed conditions clauses, and, indeed, the purpose of § 4.3A, is to encourage low, competent bids.

> "Cost hazards are such in subsurface areas that qualified contractors, prior to the adoption of the article used in standard forms of government contracts, were obliged to make extremely high bids based on the assumption that the worst conditions conceivable would be met in the performance of the work. Drafters of contract forms foresaw greater economy to the government if contractors could be encouraged to bid upon normal conditions, with the assurance that they would be reimbursed in case of abnormal conditions actually encountered and to the extent that they actually increase costs. The revision of the costs due to conditions that are abnormal is accomplished by what the Changes article denominates an 'equitable adjustment'." Anderson, *Changes, Changed Conditions and Extras in Government Contracting*, 42 Ill. L. Rev. 29, 47 (1947).

> To ignore this policy is to open the door to disastrous consequences for the State.

*Id.* at 645, 217 S.E. 2d at 696.

We conclude that the evidence amply supports the trial court's findings that the parties were mutually mistaken at the time they entered into this contract as to the conditions that were going to be encountered. In addition to the conditions which were indicated in the contract itself, as discussed above, the record is replete with evidence that the earth material prevailing at the work site was not anticipated even by the defendant. Defendant's Resident Engineer acknowledged that the 16 months allotted to plaintiff to complete its unclassified excavation work, as well as all sequential work, in fact was a rela-

tively "quick completion date." Further testimony of this witness was to the effect that, notwithstanding the contract provision that for the most part "[s]oils should pose no great problems on this project....," the soils did present a "considerable problem to this contractor from day one." The Resident Engineer, in discussing the Black Gap area, stated that "[i]t's an ordinary assumption that we made that the material coming out of the cut area was supposedly suitable, usable material;" while defendant, in its brief, now concedes that the material encountered in the Black Gap cut "was too wet in its natural condition for the construction of roadway embankments." Although the soils specialist tendered by plaintiff testified that knowledge as to the moisture content of the soil would have been the most important single piece of information in evaluation of these soils, no such documentation was present in the defendant's subsurface investigation for this project. This expert testified that in his opinion the contract documents, most particularly the subsoil investigation report, would not have alerted a reasonable and prudent contractor as to the soil conditions which were actually encountered.

Finally, we note that the plaintiff's bid for this project of $5,311,450.82 was in line with the defendant's Engineer's estimate of $5,205,141.67. This was also true of the parties' respective bid and estimate, $3,370,930 and $3,328,260, for the main bid item of unclassified excavation work. The foregoing is a significant indication that neither the plaintiff contractor nor the defendant had known of or anticipated the unstable and unworkable soil conditions which resulted in the ensuing cost overruns. Southern Paving Corporations, AGBCA No. 74-103, 77-2 BCA ¶12,813 (1977).

Based upon the above, we hold the trial court was correct in its determination that the contractor did encounter a changed condition from that indicated in the contract as provided in § 4.3A and was entitled to an equitable adjustment for additional costs incurred.

[4] Assuming the court was correct in its finding of a changed condition, defendant next argues that plaintiff is barred from recovery of additional compensation by its failure to maintain cost records in accordance with Sections 4.3 and 9.4 of the SSRS. Section 4.3 provides as follows:

> In the event that the Commission and the Contractor are
> unable to reach an agreement concerning the alleged

changed conditions, the Contractor will be required to keep an accurate and detailed cost record which will indicate not only the cost of the work done under the alleged changed conditions, but the cost of any remaining unaffected quantity of any bid item which has had some of its quantities affected by the alleged changed conditions, and failure to keep such a record shall be a bar to any recovery by reason of such alleged changed conditions. Such cost records will be kept with the same particularity as force account records and the Commission shall be given the same opportunity to supervise and check the keeping of such records as is done in force account work.

Section 9.4 details the manner of payment for work done on a force account basis as follows:

1. Labor. For all labor and foremen in direct charge of the specific operations, the Contractor shall receive the base rate of wages (or scale) actually being paid by the Contractor for the class or classes of labor normally necessary to perform the work for each and every hour that said labor and foremen are actually engaged in such work, to which rate 30% will be added. Before beginning the work the Contractor shall file with the Engineer for his approval a list of all wage rates applicable to the work. Approval will not be granted where these wage rates are not actually representative of wages being paid elsewhere on the project for comparable classes of labor performing similar work, or where these wage rates include costs paid to or on behalf of workmen by reason of any fringe benefit.

2. Bond, Insurance, and Tax. For property damage, liability, and workmen's compensation insurance premiums, unemployment insurance contributions and social security taxes on the force account work, the Contractor shall receive the actual cost, to which cost 6% will be added. The Contractor shall furnish satisfactory evidence of the rate or rates paid for such bond, insurance, and tax.

3. Materials. For materials accepted by the Engineer and used, the Contractor shall receive the actual cost of such materials delivered on the work, including transportation charges paid by him (exclusive of machinery rentals as

hereinafter set forth), to which cost 15% will be added.

4. Equipment. For any machinery or special equipment (other than small tools) including fuel, lubricants, cutting edges, all repairs and all other operating and maintenance costs (other than operator) plus transportation costs for equipment not already on the project, the Contractor shall receive the rental rates listed in the current schedule published by the Associated Equipment Distributors. When equipment is used for a period less than one month, the rental rate shall be computed on an hourly basis using an hourly rate which is 1/176 of the monthly rate. When equipment is used for a period of one month or more, the rental rate shall be on a monthly rate basis.

5. Miscellaneous. No additional allowance will be made for general superintendance, the use of small tools, or other costs for which no specific allowance is herein provided.

6. Compensation. The Contractor's representative and the Engineer shall compare records of the cost of work done as ordered on a force account basis.

7. Statements. No payment will be made for work performed on a force account basis until the Contractor has furnished the Engineer with duplicate itemized statements of the cost of such force account work detailed as follows:

a. Name, classification, date daily hours, total hours, rate, and extension for each laborer and foreman.

b. Designation, dates, daily hours, total hours, rental rate, and extension for each unit of machinery and equipment.

c. Quantities of materials, prices, and extensions.

d. Transportation of materials.

e. Cost of property damage, liability and workmen's compensation insurance premiums, unemployment insurance contributions, and social security tax.

Statements shall be accompanied and supported by receipt-

> ed invoices for all materials used and transportation charges. However, if materials used on the force account work are not specifically purchased for such work but are taken from the Contractor's stock, then in lieu of the invoices the Contractor shall furnish an affidavit certifying that such materials were taken from his stock, that the quantity claimed was actually used, and that the price and transportation claimed represents the actual cost to the Contractor.

The procedures under the foregoing provisions for obtaining additional compensation based on changed conditions were discussed in *Blankenship Construction Company v. Highway Commission*, 28 N.C. App. 593, 222 S.E. 2d 452, *disc. review denied* 290 N.C. 550, 230 S.E. 2d 765 (1976). The Court defined the basic obligations of the Contractor as (1) insuring that notice of its intended claim is given to the Engineer or Commission, (2) maintaining accurate and detailed cost records with the "particularity of force account records," and (3) providing the Commission the opportunity to supervise the keeping of its records. Construing the policy of Section 4.3, the *Blankenship* Court emphasized that the State must be given the chance to supervise and check records as the work progresses in order to protect itself from a claim based on inaccurate cost estimates.

As discussed heretofore, we agree with the trial court that sufficient notice of its intended claim was properly given by the plaintiff. We also find that accurate and detailed cost records were maintained during the course of the work and that defendant was given ample opportunity to oversee these records had it desired to do so.

The foreman's daily reports, maintained under the supervision and review of the plaintiff-contractor's job superintendent, constitute the base source and record of the contractor's cost of performing its unclassified excavation work. These reports, consisting of fourteen volumes, record the following information: weather conditions, the name of each operator and the particular piece of equipment he was operating, the actual hours each operator worked, the actual hours each piece of equipment was working, and the actual hours each piece of equipment might have been idled. On the back of each such report the accompanying information was recorded: the actual cut and fill station numbers where the equipment was working, usually the distances of the hauls, the quantity of unclassified excavation moved, and then any pertinent remarks with respect to the nature of the work

tion material being encountered, and the repairs required for any piece of equipment which was idled as a result of a breakdown. Costs, including labor, equipment and material costs, were maintained on a monthly basis on the contractor's computer. Proper percentages in accordance with Section 9.4 were added to the labor and materials costs and for insurance, bond and taxes. Although the compilation of total costs presented at trial was prepared in part by later substituting the applicable AED equipment rate for the plaintiff's "in house" costs, the costs were maintained currently with the work performed. They required only a procedural rate substitution for the equipment costs upon defendant's request at any time to be in the form prescribed by Section 9.4. Plaintiff's costs for additional rock borrow required by the unstable soil conditions were established at a set unit price in a supplemental agreement covering rock borrow from the same source. Costs for demobilization of equipment, due to the unexpected termination of the work necessitated by the changed conditions, were submitted to defendant based upon the percentage of unclassified excavation not completed on the project.

The Area Engineer for the contractor, who was on the project during performance from two to three days each month, monitored and compiled the contractor's extra costs associated with the changed conditions. Concerning the accuracy of these records and compiled costs, defendant's Resident Engineer testified as follows:

> I would agree that the contractor kept good account of where equipment was working and what it was doing, even prior to that time (the date of notice of changed condition), on those daily reports. I would agree that Groves kept pretty good records out on the job . . . . They kept good records on production rate out on the job . . . . If you were satisfied they were accurate records, as long as you had a daily record or when and where equipment was working, the dollar figures could be put on those records at any time. I don't have any reason to question their records about actually where equipment was, how many hours it was working and what it was doing each day.

With respect to the foregoing, the trial court made the following findings not excepted to by appellant:

> That the plaintiff had always during this project maintained detailed daily labor and equipment reports. That the

daily reports reflected the total hours of all equipment and labor for a particular day and reflected what the men and equipment were actually doing, i.e., unclassified excavation, force account, blasting, etc.

Although the above records and costs were maintained by plaintiff during the course of the work performed, defendant consistently declined any opportunity to supervise and check the records which it now contends are inadequate. Defendant's Resident Engineer testified that at the parties' cost records meeting of 2 October 1973, he was shown how the records were going to be kept. He acknowledged that, even though the plaintiff kept "pretty good records out on the job" and advised him that printouts on the costs from the daily records could be obtained on a weekly basis, he did not request the computer printout or review the daily records on a regular basis. Significantly, this same witness testified that since he did not consider the project work to be affected by any changed condition, "[a]fter the meeting I really wasn't too much interested in what he was going to do with his records." Not only did the defendant fail to request that plaintiff alter its method of record keeping during progress of the work, it actually encouraged plaintiff, by letter dated 4 October 1973, not to keep records as if by force account, asserting such documentation would be "impractical" and "not render anything useful to either party." We find the record fully supports the trial court's finding that the defendant ignored the opportunity to review the record keeping of the plaintiff after being given notice of the asserted changed condition on 15 August 1973.

Inasmuch as the record supports the findings that plaintiff did keep accurate and detailed records with the particularity of force account records and that defendant was in fact provided the opportunity to review these records, which opportunity it disregarded, we find this assignment of error to be without merit.

[5]   We further find no merit in defendant's contention that the court improperly admitted into evidence plaintiff's Exhibits 18 and 19(b), respectively, consisting of the daily work reports and the total extra costs compilation based on these reports. For reasons discussed previously, Sections 4.3 and 9.4 of the SSRS present no bar to the admission of these documents. We also find the records and compilation admissible into evidence under the business entries exception to the hearsay rule.

The admissibility requirements for such documents were set forth in *Lowder, Inc. v. Highway Commission*, 26 N.C. App. 622, 217

S.E. 2d 682, *cert. denied* 288 N.C. 393, 218 S.E. 2d 467 (1975): (1) the entries must be made in the regular course of business, (2) the entries must be made contemporaneously with the events recorded, (3) the entries must be original entries, and (4) the entries must be based upon the personal knowledge of the person making them. Records compiled under the above specifications are admissible into evidence since the circumstances indicate that they are sufficiently "reliable and trustworthy as to reflect accurately the actual costs incurred." *Id.* at 650, 217 S.E. 2d at 700.

Plaintiff's Exhibit 18, the foreman's daily reports, was the base source for the compilation of damages and recorded the labor and equipment hours expended in the unclassified excavation work. It meets the business entries exception to the hearsay rule in that (1) appellant's counsel stipulated they were original entries kept under the contractor's job superintendent's supervision, (2) the entries were made in the regular course of business, (3) the entries were made contemporaneously with the events recorded, and (4) the entries were based upon the personal knowledge of the persons making them. Their reliability and trustworthiness were acknowledged by defendant's Resident Engineer who testified that "Groves kept pretty good records out on the job" and that he did not have "any reason to question the records about actually where the equipment was, how many hours it was working and what it was doing each day." Plaintiff's Job Superintendent testified that he reviewed these labor and equipment reports each day for accuracy.

We find plaintiff's Exhibit 19(b), the compilation of costs, admissible for the same reasons discussed above. This document was based upon Exhibit 18. *See Lowder, Inc. v. Highway Commission, supra.* Since the costs for the unclassified excavation work had been maintained on plaintiff's computer at the time the work was performed, all that was necessary in its preparation was the recomputation of equipment costs from "in-house" rates to AED rates. This document also meets the tests of trustworthiness and reliability. We do not consider defendant's attempt to raise for the first time on appeal its objection to this exhibit as being a computer record.

[6] Defendant also assigns error to the court's ruling that the plaintiff was entitled to recover from the defendant all liquidated damages previously withheld. These damages were assessed pursuant to the following special provision of the contract:

> Liquidated damages of one hundred dollars ($100.00) will be charged the contractor for each calendar day after October 1, 1973, that the project from station 1029+04 to station 30+00 (including -Y- lines and driveways) is not complete to the extent that the pavement is placed, the shoulders are constructed, the guardrail is installed, and two-way traffic is placed and then maintained on same.

Under this clause, plaintiff was assessed liquidated damages in the sum of $15,500.00.

In *Reynolds Co. v. Highway Commission,* 271 N. C. 40, 50, 155 S.E. 2d 473, 482 (1967), the Court stated:

> Obviously, as an elementary general proposition, a contractor is not liable under a clause for liquidated damages based on a time limit if his failure to complete the contract within the specified time was wholly due to the act or omission of the other party in delaying the work, whether by omitting to provide the faculties (sic) or conditions contemplated in the contract to be provided by him, or by those for whom he is responsible, or by interfering with the work after the contractor has begun, or otherwise. *Dunavant v. R.R.,* 122 N.C. 999, 29 S.E. 837; *United States v. United Engineering & Contracting Co.,* 234 U.S. 236, 58 L.ed. 1294; Anno. 152 A.L.R., p. 1350; 22 Am. Jur., 2d, Damages, § 233; 25 C.J.S., Damages, p. 1096. The concept of justice back of the decisions appears to be that the other party should not be allowed to recover damages for what he himself has caused.

The record contains plenary evidence to support the trial court's finding that "the completion date of October 1, 1973 for the first phase of the project would have been met by the plaintiff had it not encountered the changed conditions and been granted the proper extensions of time." Defendant's Resident Engineer testified that as of 8 June 1973 the plaintiff was 90% complete on the first phase. However, it was at this point that plaintiff had depleted all available sources of rock and was left with soil which was too wet to be used without rock for embankment fills. Under these conditions, the contractor requested in several meetings that it be allowed to waste this unsuitable material. As testified to by the Resident Engineer, defendant denied the request, contending that the material was in fact suitable since it

was indicated to be so in the contract. The plaintiff's request was denied even though the Resident Engineer later testified that at this same time the "material at Black Gap was wet when it came out of the cut . . . and it seemed to get wetter the further we went down into it." This witness also testified that if the contractor had been allowed to waste the material in June as he requested, there was no doubt he could have finished the project sooner, possibly by the 1 October completion date. Even when the project was behind schedule, the Resident Engineer stated that he was completely satisfied with the work effort being expended by the contractor. In the latter part of October defendant finally realized that the unsuitable soil in the Black Gap cut was preventing any completion of the project, and plaintiff was allowed to waste this material as he had requested months earlier.

By its refusal to allow plaintiff to waste the unsuitable material when initially requested, coupled with its knowledge that the wet, unstable soil could not be utilized as indicated in the contract, defendant clearly waived any expectation of adherence to the contract schedule. *See, Graham and Son, Inc. v. Board of Education,* 25 N.C. App. 163, 212 S.E. 2d 542, *cert. denied* 287 N.C. 465, 215 S.E. 2d 623 (1975). On the basis of these facts, defendant was not entitled to assess liquidated damages and the court properly ordered their recovery by plaintiff.

[7] By its next assignment of error, defendant contends the trial court erroneously calculated the credits for payments made by the Board of Transportation to the plaintiff-contractor. As to the finding submitted on appeal which defendant now asserts would have been a correct calculation of credit, we note at the outset that the record contains no request by defendant to the trial court to make such a finding. Defendant should have requested the court to make the finding and excepted to its failure to do so. This proposed finding of fact is therefore not before us for consideration. *Logan v. Sprinkle,* 256 N.C. 41, 123 S.E. 2d 209 (1961). Although defendant has properly included in its brief the assignments of error and exceptions to the findings of fact in which the trial court calculated the disputed credits, it has completely failed to afford this Court any citations of authority or the portions of the record upon which it relies to support its argument. Accordingly, under Appellate Rule 28(b) (3) its argument is deemed abandoned. *State v. Minshew,* 33 N.C. App. 593, 235 S.E. 2d 866 (1977); *State v. Tuttle,* 33 N.C. App. 465, 235 S.E. 2d 412 (1977). This Court will

In re Foreclosure of Deed of Trust

not "fish out" an appellant's exception which is not properly presented. *Lee v. Tire Co.,* 40 N.C. App. 150, 157, 252 S.E. 2d 252, 257 *dis.*

*review denied* 297 N.C. 454, 256 S.E. 2d 807 (1979). Notwithstanding, our review of the record discloses no valid reason to alter the trial court's finding.

We conclude that the court's findings of fact are supported by competent evidence and support the court's conclusions of law.

**[8]** We do, however, find merit in defendant's contention that the court erred in awarding to plaintiff compensation for its expert witnesses. We are aware that the trial court did find that the expert witnesses "were required" to be present during the entire trial. However, as conceded by plaintiff in its brief, no subpoenas for these witnesses are to be found in the record. Under existing case law, the trial judge was therefore without authority to tax the expert witness fees against appellant as a portion of the costs. *State v. Johnson,* 282 N.C. 1, 191 S.E. 2d 641 (1972), *aff'd* 286 N.C. 331, 210 S.E. 2d 260 (1974); *Siedlecki v. Powell,* 36 N.C. App. 690, 245 S.E. 2d 417 (1978); *Redevelopment Commission of Winston-Salem v. Weatherman,* 23 N.C. App. 136, 208 S.E. 2d 412 (1974).

We have considered defendant's remaining assignments of error and find them to be without merit.

That portion of the judgment ordering the defendant to pay expert witness fees is reversed. The remainder of the trial court's judgment is affirmed in its entirety.

Affirmed in part and reversed in part.

Judges CLARK and ERWIN concur.

Judge ERWIN concurred in this opinion prior to 31 October 1980.